**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gary Richard GRESHAM,
Defendant-Appellant.**

No. 77–5582.

United States Court of Appeals,
Fifth Circuit.

Nov. 27, 1978.

Joe S. Holland, El Paso, Tex. (Court-appointed), for defendant-appellant.

Jamie Boyd, U. S. Atty., LeRoy M. Jahn, Stanley Serwatka, W. Ray Jahn, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, GEE and RUBIN, Circuit Judges.

GEE, Circuit Judge:

Gary Richard Gresham, convicted of violating the Dyer Act, appeals raising issues related to his two confessions.

A grand jury in the Western District of Texas charged that Gresham transported a 1975 Chevrolet Monte Carlo, a stolen vehicle, from Florida to the Western District of Texas, knowing it to have been stolen.

On May 28, 1978, driving the automobile described in the indictment, Gresham, a resident of Austin, Texas, stopped in El Paso at 3 o'clock in the morning and tried to sell a pistol and a shotgun. This aroused suspicion. The officers communicated with the National Crime Information Center computer in Washington and were informed that the vehicle was registered as the property of Ronald Suskind and had been reported stolen in Fort Myers, Florida. The jury was allowed to hear this evidence but, on objection for hearsay, the trial court sustained the objection and cautioned the jury that the NCIC report was not to be accepted as proof of the truthfulness of its contents.

Strangely, the prosecution did not put Mr. Suskind on the stand, offered no other proof of ownership, and offered no direct independent proof from any source that the vehicle had, in fact, been stolen. Instead, it chose to rely primarily on two written confessions from Gresham that he did steal the automobile from an apartment house parking lot in Fort Myers.

Appellant's two confessions, though consistent and detailed, are not overly lengthy

and we set them out in the margin.[1] His attack on his conviction advances along two general lines. The first addresses the adequacy of the voluntariness hearings, conducted outside the jury's presence, concerning the confessions. The second maintains that the confessions were insufficiently corroborated as to the identity and stolen character of the automobile.

### Corroboration

■ It is the law of this circuit, grounded in Supreme Court authority, that one may not be convicted solely on the basis of an

---

1. May 28, 1977

    \*    \*    \*    \*    \*    \*

My name is Gary Richard Gresham. I live at 1208 Turtle Creek Blvd., Austin, Tex. I am 24 years of age. My name is Gary Gresham and I live in Austin, Texas. My social security number is 452–80–9720. Approx. two or three weeks ago, I was in Hollywood, Calif. I was looking for work. I had been in Hollywood for about three weeks. I couldn't find work so I decided to look somewhere else. Before leaving, I took a car. The car belonged to Ronald Hodges. I met him in Calif. but I didn't really know him. He owned a 1975 Chev. Camaro, reddish-brown with a black vynal top. I believe the license number was 77 Calif. 612 NXE. I had borrowed the car from Hodges and I had his permission to drive it. I was supposed to use the car while I was looking for work. He did not give me permission to leave the city. He had four credit cards in the glove compartment. I left Hollywood and drove across the U.S. went to Fla. I was using the credit cards belonging to Hodges. I did not attempt to alter the credit cards. I got to Miami and then turned around and started to backtrack. I ended up in Denver, Colorado. I stayed in Denver about a week looking for work. I couldn't find work, so I decided to go back to Fla. I picked up a hitch-hiker about 15–20 miles north of Denver. He had a T.V. and Stereo with him. He also had a sleeping bag, but I didn't find out until later that he had some guns rolled up in it. He told me that his name was Rick Wynn. When I picked Wynn up I was driving a 1975 Monte Carlo, green with a vynal tan top. I believe the license number was 77 Fla ASW 020. I took this car from Ft. Myers, Fla. I took this car from an apt. building parking lot. I was going to take the C.B. radio from the car. I got into the car with a coathanger and was looking for some money when I found the keys. I left the Camaro parked nearby and left heading for Colo. Myself and Wynn left Colo. and ended up in El Paso, Texas. When we got into El Paso we were both broke. Wynn then told me about some gun that he had in the sleeping bag. We decided to try and sell them. We went to the 76 Truck Stop and tried to sell them. He had a double barrel 12 ga., .410 single shot, .22 bolt action, .32 Automatic. We talked to only one man. He did not want to buy the guns so we left. We stopped at McClain's truck stop. I sold the 12 ga. shotgun to one of the attendants there. A policeman drove up before we left. He had seen the guns.

He found out that the car was stolen and he placed myself and Wynn under arrest. I would like to say that I was not promised anything nor was I threatened in order to induce me into giving this confession. I gave it because I think that it will make everything easier all the way around. End.

    \*    \*    \*    \*    \*    \*

June 1, 1977

I, Gary Richard Gresham, have been informed by Wallace A. Crossmon and Charles G. Riley that they are Special Agents of the FBI and that this statement will concern the theft and interstate transportation of two stolen cars. Agent Crossmon advised me of my rights and I understand what my rights are. I do not want a lawyer and no threats or promises have been made to me. I make the following statement freely and voluntarily.

About 6 or 7 weeks ago I went to Hollywood, California to look for work. I met Ronald Hodges in a bar and went out with him a few times. He had a 1975 Chevrolet Camaro with a black vinyl top. About three weeks ago I stole Hodges' 1975 Camaro and drove on Interstate 10 from Los Angles to Jacksonville, Florida and from there to Fort Myers, Florida. I did not have permission to take the Camaro.

In Fort Myers, Florida, I left the Camaro in the parking lot of an apartment building and stole a 1975 Monte Carlo, green with a tan vinyl top. I was just going to steal the CB radio out of it, but the keys were in the glove compartment so I stole the Monte Carlo and drove it via Routes 10 and 25 to Denver, Colorado. I stayed in Denver about 5 days. I then decided to go home to Austin so I drove the stolen Monte Carlo to El Paso where I intended to abandon the car and hitchhike to Austin.

On the way to El Paso I picked up a hitchhiker, Rick Wynn.

I arrived in El Paso about 3:30 A.M. Saturday morning, May 28, 1977.

I was arrested by El Paso city police at a truck stop in El Paso while I was trying to sell some guns that Wynn had.

Wynn did not know that I had stolen the Monte Carlo. The Monte Carlo had Florida License number ASW 020. I also remember the license number on the Camaro that I stole in California was 612 NXE.

I have read this statement including this and two other pages and it is true and correct to the best of my knowledge.

    \*    \*    \*    \*    \*    \*

uncorroborated confession. *United States v. Abigando*, 439 F.2d 827 (5th Cir. 1971). Doubtless this reflects at least two concerns, one ancient and the other perhaps more recent: that a crime in fact has been committed and that the accused be one having at least a plausible connection with it. In earlier times, we are told, with travel and communications slow and unreliable, it was not uncommon for persons to disappear for long periods of time, perhaps to return only after an accused had suffered for having supposedly made away with them. Improvement in these aspects of life, while reducing the former danger, has introduced its own new hazard: that sensational and widely-publicized crimes may produce spurious "confessors," drawn forth in some strange manner by the aura of notoriety that surrounds such crimes.

Nevertheless, it is true than when an otherwise admissible confession is introduced, the focus of trial shifts to determining its reliability. And if it is determined to be reliable, independent proof of all elements of the crime is not required, though the evidence as a whole—including the confession—must of course always be such that the jury could properly conclude that it establishes guilt beyond a reasonable doubt. *United States v. Abigando, supra* at 832–3. A degree of corroboration may even be found in the detailed nature of the confession itself, or in its indication of knowledge by the accused of such facts as he would be unlikely to know were he not the criminal. *Ibid.*

Bearing these observations in mind, we turn now to the confessions and independent evidence in Gresham's case. About his connection with the crime, we need have little doubt: he was apprehended in possession of the Monte Carlo automobile alleged to have been stolen. As for the question whether the existence of a crime at all was established, we note that the elements of such a violation of the Dyer Act as that with which Gresham was charged (18 U.S.C. § 2312) are three: a stolen vehicle, known by the defendant to be such, and transported by him in interstate commerce. All of these are amply covered by each of Gresham's confessions, and covered in such ample detail as itself to inspire a degree of confidence in their verity.

In addition, there was independent verification of one element which appears in each, the license number of the Camaro automobile purloined by Gresham in Hollywood, California, and abandoned by him on the Florida parking lot. One of the arresting officers testified that in checking it by means of the license number given him by Gresham, and which he could have known of in no other way, he verified that the Camaro was stolen in California and abandoned on the same Florida parking lot from which the Monte Carlo automobile in issue was stolen. Since this evidence, though hearsay, came in without objection, "it is to be considered and given its natural probative effect as if it were in law admissible." *Daniel v. United States*, 234 F.2d 102, 107 (5th Cir. 1956), *quoting Diaz v. United States*, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500 (1911). As such, it vouches powerfully for the reliability of the confession and its account of Gresham's cross-country peregrinations. More, it bears significantly, if circumstantially, on all three elements of the crime charged, since it indicates that someone abandoned one stolen car bearing a California license number known to Gresham on the parking lot from which the Monte Carlo automobile in which he was apprehended commenced its interstate wanderings.

Nor is other evidence supporting the confession's reliability entirely lacking. Interstate transportation of the Monte Carlo automobile was corroborated by a gasoline sales ticket, dated four days before Gresham's first confession, signed by him, and found in his possession, indicating a purchase in Cody, Wyoming. There was testimony that credit cards found in the possession of Gresham had been in the possession of the Camaro owner, a name mentioned in Gresham's confessions, when they were stolen in California. And a license plate receipt for the Monte Carlo automobile's Florida plates was given the arresting officers

by Gresham, which indicated its owner was a person other than Gresham. In addition, there was testimony, some actually elicited by Gresham's counsel on cross-examination, that the National Computer Information Center reported the Monte Carlo automobile as stolen. As to some of this testimony objection was made and the jury was instructed not to consider it as establishing that the Monte Carlo was in fact stolen. Finally, there was testimony by persons on the scene that both Gresham and his passenger physically resisted arrest.

■ On consideration of all the above, we conclude that there was sufficient evidence independent of the confession to establish beyond a reasonable doubt that Gresham had transported the Monte Carlo vehicle interstate. There was also evidence indicating that Gresham abandoned the Camaro vehicle, recently stolen in California, on the very lot from which the Monte Carlo automobile, registered in another's name, was taken. And while this evidence, standing alone, might have been insufficient to establish that Gresham stole the Monte Carlo or knew it was stolen, we think it sufficient to corroborate the confession. As we said in *Abigando, supra* at 833, "a confession can be corroborated by bolstering parts of it to show trustworthiness. Some elements can be proved by the confession alone." Here the confessions were adequately corroborated and either, together with the other evidence, formed a sufficient basis for the jury verdict—assuming voluntariness. To that issue we now turn.

### Determining Voluntariness of the Confessions

At Gresham's trial the government first presented as witnesses Messrs. Thetford and Duran, workers at the truck stop where Gresham was apprehended, who had been present at his arrest. After a short cross-examination of each, defense counsel indicated a desire to reserve these witnesses for further questioning at a separate hearing on the voluntariness of Gresham's confession. The next government witness presented was an Officer Drennan, a motor vehicle theft investigator with the El Paso Police Department, who took Gresham's confession of May 28. At the point in his testimony at which that matter was to be gone into, defense counsel approached the bench and requested that the voluntariness hearing be held, stating his position to be that Gresham had given the confession while in a condition of such extreme fatigue, complicated by drugs and alcohol, as to render it involuntary. The court questioned whether the request was timely, the prosecutor pointed out that Rule 12, Fed.R. Crim.P., required that such a request be made before trial, and the court at first refused to grant such a hearing.

The colloquy at the bench continued, however, the court observing that Officer Drennan seemed the key witness on the question. The court then retired the jury and permitted both sides to question Drennan, who maintained that Gresham had shown no signs of unusual fatigue or other abnormal state at the time he confessed. With this, the court declared its intention to admit the confession and refused permission for the defense to interrogate the reserved witnesses Thetford and Duran outside the presence of the jury, though defense counsel was offered a recess to confer with them. Among other things, the court observed, "I'm not going to let you take their deposition. This is not a discovery procedure. That motion is not timely."

The jury returned, Drennan's testimony continued in its presence, and the May 28 confession was received in evidence over objection questioning its voluntariness. Later in the trial a defense request for a separate suppression hearing on the second confession, that made to the FBI on June 1, 1977, was overruled. The federal agent who took that confession testified at length as to Gresham's condition at that time, describing it as sober, coherent and not fatigued. Nothing in the testimony of the federal agent indicates that the first confession was used in any way to induce the second or figured in its extraction in any way. Indeed he testified that he did not receive a copy of Gresham's initial confes-

sion made to the El Paso authorities until after Gresham confessed the second time to him. The defense did not cross-examine on Gresham's condition, presented no witnesses, and with this the evidence closed. The second confession was admitted in evidence over objection as to its voluntary nature.

In these circumstances, we entertain few doubts about the admissibility of Gresham's second confession. He received proper *Miranda* warnings before giving it, the objections of fatigue and intoxication made to the first scarcely apply where he had been in custody for four days before giving it, and the agent testified to his good condition at the time. Nor does the fact that the first confession was questioned invalidate the second where the two were significantly separated by passage of time, the first was not used to exact the second, and there was no factual basis for a claim that the two different police authorities worked together to obtain it. In disposing of a similar claim, that a second confession made to federal authorities was tainted by one made four weeks earlier to state ones,[2] we held:

> The ruling of the district court denying the admission of the California confession on this ground gave Thor more than his due under the decisions of this circuit. Thus the short answer to his allegation of taint is that there was no taint. In *Kulyk v. United States*, 5 Cir., 1969, 414 F.2d 139, we held that a statement made to a state officer while the defendant was detained in violation of the Georgia statute requiring that a prisoner be brought before a magistrate within 48 hours of arrest was admissible in a trial on federal charges. Thor was not in federal control when he gave the California confession, and there is no factual basis whatever, indeed no claim, of a working arrangement between state and federal officers to obtain such a confession. Cf. *United States v. Rollerson*, 5 Cir., 1974, 491 F.2d 1209.

*United States v. Thor*, 512 F.2d 811, 813–14 (5th Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 445, 46 L.Ed.2d 384 (1975).

These observations do not, however, dispose of the question whether a separate voluntariness hearing should have been granted by the court as to the second confession. This hearing was first requested in the course of the trial and without assignment by the defense or there appearing in the record any specific grounds for contending that the second confession was not voluntary. Assuming that such a request was sufficient to raise the issue, a matter which we do not decide, we conclude that the court was not required to grant the request at the time it was made. Rule 12, Fed.R. Crim.P., directs that motions to suppress evidence "must be raised prior to trial" and provides, in its subsection (f), that requests for such hearings if not so raised are waived, the court having power for cause shown to grant relief from the waiver. Here the trial court chose not to do so, no cause for relief from the waiver appears in the record, and we cannot say the court erred in its refusal.

As to the defense request for a separate hearing on the voluntariness of the first confession, the matter is not so clear. That request, too, though it was specific as to grounds and though these found some footholds in the record evidence, came after Rule 12's waiver had occurred. The trial judge, noting that the request was untimely, nevertheless granted a partial relief from the waiver and permitted the defense to question the witness Drennan, seen by the court as the key one, out of the presence of the jury. He refused to hear two other witnesses to Gresham's condition separately, however, and ruled the confession admissible on the basis of the testimony of Drennan, though he did offer the defense a recess to confer in private with the other two witnesses.

Though the trial court doubtless possesses some discretion in such a matter, we

---

2. Held inadmissible because of a four-day delay in taking that defendant before a state magistrate.

think that—if any relief whatever from the waiver were to be granted—it should have permitted the two additional witnesses to be questioned at the separate hearing.[3] *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), mandates such hearings as a matter of due process, requires that they be fair, and suggests that a "fair hearing" must take into account "all the relevant evidence." 378 U.S. at 389 n.16, 84 S.Ct. 1774. We cannot say that the evidence of Thetford and Duran, both present at the arrest, may not have been relevant to determining Gresham's condition at that time and hence, arguably and to a severely lessened degree, to that at the time of his first confession given thirteen hours later. We therefore conclude that, in refusing to hear this barely-relevant evidence separately, the district court committed error—and constitutional error at that. This does not, however, end our inquiry. Having so concluded, we must determine whether, under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), this error requires reversal of Gresham's conviction. It does, under *Chapman*'s rule, unless we are "able to declare a belief that it was harmless beyond a reasonable doubt," *Id.* at 24, 87 S.Ct. at 828,[4] or unless the error was waived.

The issue is extremely narrow. There is no question here of a refusal by the trial court to permit defense counsel to put Thetford or Duran on—in the presence of the jury—for whatever either might have said. Both were held available for counsel, and Thetford did in fact so testify. In his opinion, Gresham at arrest was fatigued but in possession of his faculties and not in an abnormal condition. Counsel was offered a recess to interview Duran,[5] but declined the court's offer, did not do so (so far as the

record indicates), and made neither offer of proof about Duran's testimony nor any suggestion that it would have been more helpful to the defense than Thetford's was. Only three possibilities suggest themselves: either defense counsel found an opportunity to interview Duran and knew that his testimony would be adverse, or he knew that it would be favorable but made no offer of proof, or he refused to discuss Duran's testimony with him to determine what it would be despite the relief from his Rule 12(f) waiver accorded by the recess offered him for this purpose. If the first, the error was clearly harmless. The second seems of truly miniscule likelihood. The third amounts to a waiver of the opportunity to make an offer of proof, the effects of which offer on the trial judge we cannot know. Had one been made, as one possibility, he might have been willing to hear Duran separately. Thus there is literally nothing in the record to support the view that the trial court's refusal to hear Thetford and Duran separately worked any harm on Gresham, though the defense had full opportunity to lodge there any helpful matter it knew of.

■ Finally, we doubt that the admission of the first confession, even if arguably irregular, significantly harmed Gresham's defense in light of the proper admission of the second one. Both are substantially identical, though the first is slightly more detailed, and where one full and voluntary confession has come before a jury it is doubtful that the introduction of another similar one could add greatly to the damage done by the first.

On a totality of the above considerations, then, we believe that the error of the trial court in refusing to hear Thetford and Duran out of the jury's presence before ruling the first confession voluntary was harmless beyond a reasonable doubt.

3. One did testify later, before the jury, and opined then that Gresham seemed in possession of his faculties when arrested.

4. We do not face here the situation found in *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), where a confession coerced in fact and found to have been so as a matter of law by the Supreme Court, had been submitted to the jury along with other evidence

of guilt. In those circumstances, a per se rule of reversal applies. Only had Gresham's first confession been, on this record, coerced as a matter of law or properly found below to have been coerced would the per se rule of *Payne* have applied.

5. Defense counsel had interviewed Thetford before he testified, as the record shows.

■ Finally, and independent of the above, we see no reason why Rule 103, Fed.R.Evid., should not be as applicable to a *Jackson v. Denno* hearing as to any other. Since it is, reversal of the court's ruling excluding Duran's testimony could not be had on this record without an offer of proof as to what it would have been. We do not believe that the Court's injunction in *Jackson v. Denno* that "all relevant evidence" be considered suspends normal appellate rules or permits complaint on appeal of an error not properly preserved for our attention.

Gresham's conviction is therefore AFFIRMED.

COLEMAN, Circuit Judge, dissenting:

With great deference to the views of my distinguished Brethren, I must respectfully dissent to the affirmance of this conviction.

I agree that Gresham's confession was voluntary, but this fell far short of the necessary.

In this Circuit, in prosecutions for a violation of 18 U.S.C., § 2312, interstate transportation of a stolen motor vehicle, the evidence for the government must prove beyond a reasonable doubt that (1) the vehicle was stolen, (2) the defendant transported it in interstate commerce, and (3) the defendant had the requisite guilty knowledge concerning the theft of the car, *Moody v. United States*, 5 Cir., 1967, 377 F.2d 175; *United States v. King*, 5 Cir., 1970, 425 F.2d 1163; *United States v. Casey*, 5 Cir., 1970, 428 F.2d 229, *cert. denied*, 400 U.S. 839, 91 S.Ct. 78, 27 L.Ed.2d 73.

In *Casey* we said that upon *each of these elements*, the government must present substantial evidence from which a jury might find the defendant guilty beyond a reasonable doubt, 428 F.2d at 231.

The majority opinion states, quite correctly, that the government did not put the alleged owner of the vehicle on the witness stand, offered no other proof of ownership, and offered no direct independent proof from any source that the vehicle had, in fact, been stolen. The majority says that this was "strange", as indeed it was, but

nevertheless affirms on the basis of the confessions.

I think the prosecutor fell into a monumental failure of proof—one that cannot be cured on appeal. My conclusion on this score is easily reached: (1) the government had the obligation of proving that the vehicle belonged to Suskind and (2) it could not prove that fact by Gresham's confession because, quite obviously, Gresham did not know, and could not have known, who owned the vehicle.

Thus, the Court is affirming this conviction solely on the defendant's confession, with no independent evidence to establish the trustworthiness of Gresham's confession that he stole an automobile belonging to Suskind.

I do not believe that defendants can be so exploited by such slipshod prosecutorial tactics.

See, e. g., *United States v. Frazier*, 5 Cir., 1970, 434 F.2d 994; *United States v. Abigando*, 5 Cir., 1971, 439 F.2d 827, 832; *United States v. Kitzman*, 8 Cir., 1975, 520 F.2d 1400; and *United States v. Shiver*, 5 Cir., 1969, 414 F.2d 461.

I respectfully dissent.