399 A.2d 81 (1979)
In the Matter of R. A. B., Appellant.
No. 12977.
District of Columbia Court of Appeals.
Argued November 28, 1978.
Decided March 8, 1979.
John Z. Noyes, Washington, D. C., appointed by this court, for appellant.
Margaret L. Hines, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and Paul E. Alper, Asst. Corp. Counsel, Washington, D. C., were on brief, for appellee.
Before GALLAGHER and HARRIS, Associate Judges, and PAIR, Associate Judge, Retired.
PAIR, Associate Judge, Retired:
After a factfinding hearing in the Family Division of the Superior Court, R.A.B., a 12-year-old boy, was adjudged guilty as an aider and abettor[1] in a burglary[2] and larceny[3] at Morton's Department Store, 1220 F Street, N.W. (the store). On this appeal, R.A.B. claims that the evidence was insufficient to support the adjudication. We agree and reverse.
At the factfinding hearing there was evidence in substance as follows: On February *82 7, 1977, a short time after the 7:00 p. m. closing hour of the store, the manager was informed that an unauthorized person was on the seventh floor. After a fruitless search for the person, the manager activated the sonic alarm system and called the Metropolitan Police Department.
A number of officers responded. One of them, Officer Hall, arrived a little after 7:00 p. m. As he approached the store he observed, at a distance of approximately 100 to 150 feet, four or five boys running in a westerly direction on F Street. The officer pursued and apprehended two of the boys two blocks from the store and brought them back to the store. Neither of the boys was possessed of property of the store nor was either of them identified as a participant in any criminal activity at the store. Nevertheless, R.A.B. was advised that he was under arrest, after which he was read the Miranda[4] warnings. According to Officer Hall's testimony, the following then transpired:
THE WITNESS: I asked him were you ever inside the department store. He said yes, he was. He went in the store earlier, and the store was just about to close.
BY MR. ALPER:
Q. And what else did he tell you?
A. Some of the other fellows went upstairs, but he didn't go upstairs. The other fellows went up to the second or third floor.
Q. Did he ever tell you anything about staying in the store?
A. He said that he didn't go up any higher than the street level floor.
Q. Did he ever tell you anything about staying in the store after closing hours?
A. He said he was in the store just prior to closing, and he stayed in there afterwards.
Q. Did he tell you who he went in the store with or anything like that, not mentioning any names?
A. He stated that the fellows.[[5]] I took it for granted he meant the subjects arrested with him when he was arrested.
Q. Did you ever ask them why they stayed in the store?
A. I don't recall asking that question.
Q. Did he ever tell you anything about why he stayed in the store?
A. I don't recall asking that specific question.
Q. Now, with respect to the fact that he stated he stayed on the first floor and the other people went upstairs, did he tell you that, or did you ask him about that?
A. He told me. He said he didn't go any further than the first floor. The other guys went upstairs.
As nearly as can be determined from the record, Officer Cannon arrived at the store about 7:15 p. m., apparently while Officer Hall was pursuing R.A.B. on F Street. Officer Cannon's testimony was that when he was informed that there was an unauthorized person on an upper floor and that no officer was stationed at the rear of the store building he
drove the cruiser around back, came to the rear of the store. As I got out of the cruiser and started to approach the rear of the store I could hear a whish in the air. As I looked up I saw a large box coming down.
I then ran back to the cruiser as the box hit the ground. It was a large box containing clothes from Morton's Department Store.
* * * * * *
I did see another box that was already there down on the ground.[[6]]
Commencing at twenty minutes before the 7:00 p. m. closing hour and at intervals thereafter, the manager of the store announced *83 over the public address system that the store was about to close. The final announcement was made at 7:00 p. m., and all doors except the revolving door at the front were locked and a security guard was stationed at that door.
The testimony of the security guard was that no person entered the store after the first announcement of closing and that after 7:00 p. m., no person left the store through the revolving door except employees. Neither the security guard, the manager, nor any other witness was able to identify R.A.B. as a person who, alone or in the company of others, was observed in the store or leaving it on the day of the burglary and larceny.
We can permit the adjudication of R.A.B. to stand only if there is a record showing of proof beyond a reasonable doubt that he, in some way, associated himself with the person or persons who committed the burglary and larceny; that he participated in it, either directly or indirectly, as something he wished to see accomplished; and that he intended by his actions to assure its success. Quarles v. United States, D.C.App., 308 A.2d 773 (1973); Bailey v. United States, 135 U.S.App.D.C. 95, 98-99, 416 F.2d 1110, 1113-14 (1969).
It appears from our review of the record that the only probative evidence on the issue of R.A.B.'s involvement in the burglary and larceny is (1) his admissions that he went to the store with other "fellows" and that he was in the store just before it closed, and (2) his flight from the general vicinity of the store.
Although we must view the admissions in the light most favorable to the government,[7] we are nevertheless controlled, in our review, by the well-settled case law that admissions like confessions must be corroborated by extrinsic evidence. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Naples v. United States, 120 U.S.App.D.C. 123, 128-29, 344 F.2d 508, 513-14 (1964). While the corroborative evidence need not be sufficient, exclusive of the confession, to establish guilt beyond a reasonable doubt,
[s]ufficient extrinsic evidence should be required to preserve the integrity of the right against self-incrimination, the presumption that every accused is innocent until his guilt is established beyond a reasonable doubt and the accusatorial nature of our system. [Naples v. United States, supra at 129, 344 F.2d at 514.]
There is no evidence whatsoever that R.A.B. associated himself with the unidentified person or persons who tossed boxes of merchandise from a sixth floor window; that he participated with any person or persons in the criminal enterprise; or that he sought by any act to assure its success. Cf. Blango v. United States, D.C.App., 335 A.2d 230, 235 (1975); Creek v. United States, D.C.App., 324 A.2d 688, 689 (1974).
Thus, aside from the admissions, the totality of the evidence bearing on the issue of R.A.B.'s involvement in the criminal activity was his presence on F Street some 100 to 150 feet from the store and his flight. Of course, proof of the presence of an accused at the scene of a crime cannot, without more, support a conviction of aiding and abetting its commission. Quarles v. United States, supra; Bailey v. United States, supra. "An inference of criminal participation cannot be drawn merely from presence; a culpable purpose is essential." Bailey v. United States, supra, 135 U.S.App. D.C. at 98, 416 F.2d at 1113 (footnotes omitted). Consequently, presence is significant only when it encourages the perpetrator or in some way facilitates the unlawful act. Quarles v. United States, supra. Cf. United States v. Lumpkin, 145 U.S.App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971).
Since R.A.B. was seen "a little after" 7:00 p. m. running at a "fast clip" on F Street and was apprehended a short time later two blocks from the store, it simply defies reason to urge, as does the government, that a reasonable mind could have concluded beyond a reasonable doubt that R.A.B. was at or about the same time aiding and abetting the burglary and larceny at the store.
*84 Moreover, in this situation the government's case is not strengthened by proof of R.A.B.'s flight.
The evidentiary value of flight ... has depreciated substantially in the face of Supreme Court decisions delineating the dangers inherent in unperceptive reliance upon flight as an indicium of guilt. [Bailey v. United States, supra, 135 U.S. App.D.C. at 99, 416 F.2d at 1114 (footnote omitted).]
Whatever was the motivating force behind the flight of R.A.B., the government has made no showing that it was related to the burglary and larceny. As the court said also in Bailey v. United States, supra at 100, 416 F.2d at 1115, "... guilt, as a factual deduction, must be predicated upon a firmer foundation that a combination of unelucidated presence and unelucidated flight."
We hold, as we must on this record, that the evidence was insufficient to support the adjudication.
Reversed and remanded with directions to enter a judgment of acquittal.[8]
NOTES
[1] D.C.Code 1973, § 22-105.
[2] D.C.Code 1973, § 22-1801(b), as amended.
[3] D.C.Code 1973, § 22-2201.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] The "fellows" were never identified as persons seen entering the store with R.A.B. or leaving it.
[6] There was evidence that the boxes were tossed from a sixth floor window.
[7] Branch v. United States, D.C.App., 382 A.2d 1033 (1978).
[8] Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).