more than twenty years in prison, reversal is in order.

**In re K.A., Appellant.**

No. 10–FS–1614.

District of Columbia Court of Appeals.

Argued April 10, 2012.
Decided Feb. 7, 2013.

Vernon A.A. Cassin III, for appellant, with whom Alexandra M. Walsh, was on the brief.

John J. Woykovsky, Assistant Attorney General, for appellee, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn C. Groce, Deputy Solicitor General, were on the brief.

Before WASHINGTON, Chief Judge, and BECKWITH and EASTERLY, Associate Judges.

BECKWITH, Associate Judge:

Acting on a tip, police entered the house where Appellant K.A. lived with his grandfather and cousin, found two guns under the grandfather's mattress, handcuffed the grandfather, and kept him handcuffed while paramedics provided him with emergency treatment for a sudden illness. More than an hour after police arrived, and after one officer said to K.A. and his cousin Terrell, both 17, that "I guess [the grandfather's] gonna have to come with us," and another officer encouraged the boys to "own up to these guns" because "the old man might be going to jail," K.A. told police that the guns in fact belonged to him, stating, "Man, they my guns. Take that stuff off him." Handcuffs were locked on K.A.'s wrists and taken off his grandfather's, and on the strength of that confession, K.A. was later convicted of two counts of possession of an unregistered firearm [1] and two counts of unlawful possession of ammunition [2] following a bench trial in the Family Division of the Superior Court.

Because the decisions of this court and the Superior Court's juvenile rules protect a defendant from conviction based solely on an insubstantially corroborated confession, and because the exceptional circumstances in which K.A.'s confession arose leave us with qualms about its trustworthiness, we reverse the trial court's ruling that the evidence was sufficient to permit a conviction on the possession counts with which K.A. was charged. *E.g., In re J.H.*, 928 A.2d 643, 652 (D.C.2007) (per curiam); Super. Ct. Juv. R. 111. Although the only extrinsic corroboration of K.A.'s statement—K.A.'s ability to describe the guns' appearance to police—was by no means irrelevant to the question whether they were his guns, we conclude that under the circumstances of this case, where K.A. likely would have seen the guns whether he possessed them or not, it did not constitute the substantial independent evidence that is required to corroborate a confession upon which a conviction depends. *In re R.A.B.*, 399 A.2d 81 (D.C.1979).

## I.  Facts and Procedural History

At the time of his arrest, K.A. lived with his grandfather and cousin in a small two-bedroom apartment in southeast Washington, D.C. K.A.'s grandfather, I.A., suffered from diabetes and was confined to the apartment on doctor's orders, due to a recent stroke-related injury. According to K.A.'s cousin, Terrell, their grandfather took insulin daily, and K.A. ran errands for him.

In September of 2010, I.A.'s apartment was the subject of an anonymous tip to the Metropolitan Police Department's gun tip line. [3] At 4:10 p.m. on September 7, three officers with the MPD Gun Recovery Unit

---

1.  D.C.Code § 7–2505.01(a) (2001).

2.  D.C.Code § 7–2506.01(a) (2001).

3.  Counsel for K.A. elicited testimony from MPD Officer Michael Callahan that K.A. did not fit any of the tipster's descriptions of three individuals with guns at I.A.'s apartment. There was, however, a young man with

investigated the tip; they knocked on the door to the apartment and waited, hearing "scurrying" inside. After 30 seconds or more, someone on the other side of the door asked who was there, and an officer announced it was the police. Terrell testified that he and K.A. had to walk to their grandfather's room and help him to the door. I.A. opened the door and let the officers in.

MPD Officer Jordan Katz took I.A. to the back of the apartment, through the main room where K.A., Terrell, and four of K.A.'s friends were seated—Terrell doing his homework and K.A. receiving a tattoo with equipment one of the young men had brought. Officer Katz told I.A. about the tip and asked if he could look around for guns. I.A. said he could.

Less than ten minutes after arriving at the apartment, Officer Katz found two handguns and some loose .38–caliber ammunition under the mattress in I.A.'s room. The officer who removed the guns, Michael Callahan, described them as (1) a loaded black and white Dixon Detective .25–caliber semi-automatic handgun, and (2) an unloaded black Colt .38–caliber six-shot revolver, with a black tape grip. Officer Katz handcuffed I.A., who was still in his bedroom, and told him he was under arrest for possessing the guns, since "[t]hey were in his room."

While the exact order of events following the discovery of the guns is unclear from the record, the following facts are undisputed. While Officer Katz searched I.A.'s bedroom, his partners photographed K.A., Terrell, and the four other youths in the living room and checked their IDs. Soon after arresting I.A., the officers called for backup and brought I.A., hand-cuffed, into the main room of the apartment, where the six other occupants remained sitting. Officers continued to search the apartment, including K.A.'s bedroom, but found no other guns or ammunition. After the officers had been in the apartment for about thirty minutes, at least four additional officers arrived as backup, putting at least fourteen people inside I.A.'s small apartment, seven of whom were armed police officers wearing bulletproof vests.

It was then that I.A. began having a diabetic emergency. I.A. said he needed insulin by 5 p.m. and requested an ambulance, and the officers noticed that I.A. "started to get sick." Police called the paramedics while I.A. continued to sit handcuffed in the apartment's common area with his grandsons and the four young men.

While they waited for an ambulance, the officers allowed some of the people in the apartment to leave. Officer Katz addressed the room, saying, "[I]f you don't live here and you want to go, you guys can do whatever you want." The four young men left at this time—after about thirty minutes of police presence—while K.A. and Terrell stayed in their home. Eventually the paramedics arrived and began to treat I.A., who remained in handcuffs. According to Officer Katz, I.A. at this point "wasn't looking in the best of shape," and was sitting across the small room from K.A., within K.A.'s sight.

Testimony at trial diverged somewhat concerning other interactions between the officers and the young men in the apartment. Terrell testified, for example, that once the officers found guns in I.A.'s bed-

---

dreadlocks in the group of four youths detained during the search, matching a description of one suspect. Officers allowed this young man to leave with the others who did not live at I.A.'s apartment. The government did not offer any substantive information from the tip against K.A. at trial.

room, "everything just changed." The officers emerged from I.A.'s bedroom and "said they knew it wasn't our grandfather's, so somebody in this room ought to confess up." According to Terrell, the officers "started making rude comments towards us saying, you know, we're bad kids, you know, for letting this stuff happen to our grandfather knowing about the situation he was put in right now." Officers called them "uncivilized" and "dead wrong" for letting I.A. "go through this situation right now, you know, when one of you obviously did it."

Though Officers Katz and Callahan did not recall making or hearing these specific comments, they acknowledged saying similar things about I.A.'s impending arrest to the young men at least twice. Officer Katz testified that he expressed his belief that the guns were not I.A.'s and "said something to [the] effect of 'Well, I guess he's gonna have to come with us' and I made it known that we had found guns." Similarly, Officer Callahan testified that he told the boys, "[I]f anyone wants to own up to these guns they should because the old man might be going to jail for these guns." Terrell testified that, at some point, one of the backup officers took K.A. into his bedroom alone for six or seven minutes.

It also was disputed at trial whether the police implied they would have stopped K.A. and Terrell from leaving once they released the four boys who did not live there. Terrell said, nonetheless, that he *felt* like he could not leave the apartment because the officers "got serious," "[l]ike they was really going to lock my grandfather up." Terrell said that when he saw his grandfather in cuffs getting treated by the paramedics, he was "upset" and could not leave because he was "thinking of some way how to stop this for real." To stop his grandfather from being arrested, he testified, he thought he would "[m]aybe confess."

Finally, at 5:30 p.m., after police had been in the apartment for nearly an hour and a half, and while his grandfather was receiving emergency treatment in handcuffs, K.A. told the officers: "Man, they my guns. Man, they my guns. Take that stuff off him." Before taking the handcuffs off of I.A., Officer Katz asked K.A. to describe the guns. K.A. responded: "They're two small ones. One is black and white. One has black tape on it." He did not say where the guns were in the apartment. The officers arrested K.A. and took him to the MPD Youth Division, where, an hour and a half later, he was read his *Miranda* rights for the first time that day. He then repeated some of his admissions to a detective.[4]

At trial, K.A. moved to suppress his statements due to violations of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and claimed his confession was involuntary, depriving him of due process. The court denied the motion, finding that K.A. was not in custody while in the apartment, that K.A. had voluntarily waived his rights as to the second statement made at the police station, and that the police had not coerced his confession.

At the close of the government's case, K.A. moved for judgment of acquittal, ar-

---

4. K.A. also told the detective that he found the guns behind a Dumpster near his house, and that he kept them because they "seemed like a thing you should have" and "there's a lot of shit going on in the world today." The trial court found this statement "unreliable."

During the interrogation, K.A. also agreed with the detective's statement that "[y]ou all ran into the house and you stuffed the guns under his bed or something," though this statement was inconsistent with the evidence.

guing that the government's sole evidence consisted of K.A.'s statements. The trial court denied the request, ruling that "construing all inferences in favor of the government . . . a reasonable juror could find beyond a reasonable doubt that [K.A.] committed the offense charged." The court then found K.A. "guilty or involved" on all four charged counts. This timely appeal followed.

## II. Analysis

On appeal, K.A. challenges his conviction on several grounds, arguing that: (1) his first statement was inadmissible because he was interrogated without *Miranda* warnings while in police custody; (2) police obtained his second self-incriminating statement using an unconstitutional two-step interrogation process, in violation of *Seibert;* (3) both of K.A.'s statements are constitutionally inadmissible because they were involuntary, and (4) the evidence against K.A. was insufficient because K.A.'s confession was not adequately corroborated by other evidence.

We need not decide K.A.'s *Miranda* and *Seibert* claims because the sufficiency claim is dispositive. Even assuming K.A.'s confession was "constitutionally admissible," Super. Ct. Juv. R. 111, we conclude that it was not corroborated with substan-

tial independent evidence and thus the evidence was insufficient to support the trial court's finding of "involved." [5]

### A. Principles of Law

■ In confession cases, this jurisdiction has long followed the United States Supreme Court's corroboration rule, explained in decisions issued on the same day: *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). *In re J.H.,* 928 A.2d 643, 651–52 (D.C.2007). The rule, which "is intended 'to forestall convictions based on extrajudicial confessions the reliability of which is a matter of suspicion,' " *id.* at 652 (quoting *Adams v. United States,* 502 A.2d 1011, 1022 (D.C.1986)), "requires 'the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement' before a confession can be submitted to the jury and can sustain a conviction.' " *Id.* at 651 (quoting *Opper,* 348 U.S. at 93, 75 S.Ct. 158).

■ This existing case law was then codified in the juvenile corroboration rule, Rule 111, to avoid "false confessions induced by some inner compulsion" [6] as well

---

**5.** We note at the outset that we disagree with the government's passing argument that "it does not appear that appellant raised this issue below." K.A. presents his Rule 111 corroboration claim as part of a challenge to the sufficiency of the evidence, and it is the "settled rule" in this jurisdiction that a general motion for judgment of acquittal "is deemed sufficient to preserve the full range of challenges to the sufficiency of the evidence." *Newby v. United States,* 797 A.2d 1233, 1238 (D.C.2002) (internal quotation marks and citation omitted). At the close of the government's case—which the government itself referred to as "a statement case"—K.A. moved for judgment of acquittal, arguing that "the Government's entire case rests on these statements." This motion preserved K.A.'s suffi-

ciency challenge. And although K.A. was not required to mention Rule 111 or any corroboration cases, *see id.; Tindle v. United States,* 778 A.2d 1077, 1082 (D.C.2001), this argument in support of the motion, as well as K.A.'s contentions during closing argument that "there simply is no other possessory evidence" and that his confession was false and came from his "desire to save his grandfather," cut to the heart of the corroboration rule.

**6.** It has been said that "the [corroboration] rule is designed to serve different purposes than *Miranda* and the voluntariness requirement. While these doctrines seek to protect suspects from coercive police tactics . . . the corroboration rule is premised on the idea

as to "preserve the integrity of our system of criminal justice." *Naples v. United States*, 344 F.2d 508, 513–14 (D.C.Cir. 1964); *see also* Super. Ct. Juv. R. 111 Comment (noting that corroboration and other rules "codify existing case law and practice in the District of Columbia" and citing *Naples* ). Rule 111 states in relevant part: "A constitutionally admissible, extra-judicial statement is insufficient to support a finding that the child committed the acts alleged in the petition unless it is corroborated by other evidence." The focus of the inquiry is whether "the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *J.H.*, 928 A.2d at 651 (quoting *Opper*, 348 U.S. at 93, 75 S.Ct. 158).[7]

It is hard to say precisely what quantum of independent evidence is "substantial" enough, *Opper*, 348 U.S. at 93, 75 S.Ct. 158, to support a conviction, as "the amount and kind of evidence needed to corroborate a confession will depend upon the facts of each case." *J.H.*, 928 A.2d at 652. Our decision in *J.H.* suggests a mode of analysis for this question. That case and others in the *Opper/Smith* line make clear that the amount of independent evidence required to satisfy the corroboration rule depends in part on the circumstances under which the confession was made and any indication that the confession might be false. *Id.* at 652; *see also Smith*, 348 U.S. at 155–56, 75 S.Ct. 194 (holding that the "unreliability" of the defendant's statement made it "one which should be carefully scrutinized in the light of the available independent evidence"); *United States v. Gresham*, 585 F.2d 103, 106 (5th Cir.1978) (noting that the detailed nature of the defendant's admissions "inspire[s] a degree of confidence in their verity").

In examining "the degree of corroboration required," the court in *J.H.* therefore found it useful to examine, as a "threshold matter," the voluntariness and coherence of the confession, whether it was made under trustworthy circumstances, and

that suspects may give false confessions voluntarily." *United States v. Dalhouse*, 534 F.3d 803, 806 (7th Cir.2008). Also see *Smith*, 348 U.S. at 153, 75 S.Ct. 194: "[T]hough a statement may not be 'involuntary' within the meaning of [the] exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past."

7. While a judge may decide this question when raised at the admissibility stage, such a decision is "necessarily intertwined" with the sufficiency of the evidence, as "the analysis of whether a confession is admissible requires, at least in part, an evaluation of whether it is supported by sufficient evidence." *Fowler v. United States*, 31 A.3d 88, 91 (D.C.2011). Although in some jurisdictions, "[t]raditionally, the ... court makes a preliminary [admissibility] determination as to whether testimony about the confession is sufficiently trustwor-

thy for the jury to consider the confession as evidence of guilt," *id.* (quoting *United States v. Singleterry*, 29 F.3d 733, 737 (1st Cir.1994)), "if the ... court loses confidence in its earlier determination ... and the evidence is otherwise inadequate to support a conviction, the proper course would be to enter a judgment of acquittal." *Singleterry*, 29 F.3d at 738. Moreover, this court has decided corroboration rule claims in appeals challenging the sufficiency of the evidence and disposed of those claims on sufficiency grounds. *See e.g., Adams*, 502 A.2d at 1024; *In re R.A.B.*, 399 A.2d 81, 84 (D.C.1979). Our inquiry is therefore directed primarily to the sufficiency of the corroborating evidence and, finding the confession insufficiently corroborated and the evidence "otherwise inadequate to support a conviction," ultimately to whether, after viewing the admissible evidence "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

whether there were "signs that the confession was false." 928 A.2d at 652–53. In *J.H.*, the 12–year–old defendant eventually confessed to sexually abusing his young sister, who reported the incident to their mother very shortly after it happened. *Id.* at 646. When his mother tried to question him, J.H. immediately said, "I didn't do it, I didn't do it," and later that day ran away to his grandmother's house. *Id.* Six weeks later, J.H. confessed to a plainclothes police investigator. *Id.* The investigator, whose gun was concealed by clothing, interviewed him about the incident for twenty-five or thirty minutes in a large library-like room at J.H.'s school. *Id.* at 647. J.H. made subsequent confessions to his mother and grandmother. *Id.* The court, in its threshold analysis, found no reliability problems with the confession itself. It then determined that the confession was sufficiently corroborated by the sister's prompt reporting of the abuse. *Id.* at 653.

■ The approach in *J.H.* suits the corroboration rule's underlying concerns about false confessions and the integrity of the judicial system. *See Naples, supra; see also Laumer v. United States,* 409 A.2d 190, 197 (D.C.1979) (en banc) (noting that the corroboration rule "strike[s] a balance between the need for such highly probative evidence as a confession ... and the concern that such confessions may have been procured under circumstances that render them untrustworthy"). It is a direct implication of our analysis in *J.H.* that the more untrustworthy the circumstances under which a defendant gave his confession, the more substantial the independent evidence must be to "justify a jury inference of [its]

truth." *J.H.*, 928 A.2d at 651 (quoting *Opper*, 348 U.S. at 93, 75 S.Ct. 158).

## B. Application

■ Turning to K.A.'s case, we apply the threshold analysis of *J.H.* and examine the circumstances of K.A.'s statements for signs of trustworthiness. *See J.H,* 928 A.2d at 652. While we assume K.A.'s statements were voluntary, his admission to possessing the guns bears hallmarks of a less than trustworthy confession. K.A. confessed after persistent questioning[8] by a number of officers in a small apartment that, while a familiar environment, had been filled with police officers for nearly an hour and a half. The officers repeatedly made clear that they were willing to arrest K.A.'s grandfather, despite his illness and even though they did not believe the guns were his. K.A.'s confession came in a conclusory statement—"Man, they my guns. Take those things off him"—that explicitly revealed an ulterior motivation to keep his ailing grandfather from being arrested.

That motivation is the most conspicuous sign of unreliability in the circumstances surrounding K.A.'s confession. K.A.'s admission of guilt came only when his grandfather, with whom he lived and for whom he performed at least some caretaking, "wasn't looking in the best of shape," and was receiving emergency medical treatment while handcuffed. Terrell's testimony about his own thoughts while watching his grandfather go through this ordeal suggests a similar inclination: "I was thinking of some way how to stop this for

---

**8.** While the trial court found that K.A. was not in police custody at this time—a finding we take no position on—the government does not dispute that K.A. was subjected to an interrogation while at the apartment. The trial court also commented that the officers' statements about taking K.A.'s grandfather to

jail unless one of the boys confessed were similar to the statements made in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), where the Supreme Court held that a police interrogation can consist of the "functional equivalent" of questioning.

real.... Maybe confess." By keeping I.A. handcuffed during his treatment, the police demonstrated that they had every intention to take him to jail, not to the hospital.

K.A.'s repetition of his confession to a detective inspires no greater confidence in its truthfulness, particularly considering that what minimal details K.A. added to the confession the trial judge deemed "unreliable." See *supra* note 4. The motivation to keep his grandfather out of jail had not gone away by the time of the detective's interrogation. In fact, the detective made numerous references to this fact. Among other comments, Detective Laura Aceto told K.A., "They didn't go and pick up your grandfather—not yet," and, "I think the best thing you could have done was admit to the officers that the guns were yours. I know it sucks that your grandfather would end up going. But, at least you had the compassion to do that because you obviously care about your grandfather." [9]

Turning to the corroborating evidence the government offers to bolster K.A.'s confession, we conclude that this extrinsic evidence consists solely of K.A.'s statement describing the guns' color and small size and the tape on one gun, which matched the appearance of the guns admitted into evidence. While it is relevant that what few words K.A. used accurately described the guns' appearance, it does not "support[ ] the essential facts admitted [in the confession] sufficiently to justify a jury inference of their truth." [10] *Adams*, 502 A.2d at 1023 (internal quotation marks and citations omitted). Viewed in the light most favorable to the government, *see id.* at 1024, the descriptions indicate primarily that K.A. at some point saw the guns. They do not signify that he owned them or even touched them, and they do not support an inference that K.A. constructively possessed the guns, which would require that he had "the intent to exercise dominion or control over" them. *Rivas v. United States*, 783 A.2d 125, 129 (D.C.2001). The government's theory that the "scurrying" officers heard inside the apartment came from someone hiding the guns supports only the inference that one of the seven people inside possessed the guns while each of them had the opportunity to see the guns. It is worth noting, moreover, that the officers had detained a young man who matched the anonymous tip's description of someone who possessed a gun at I.A.'s apartment, but let him go. See *supra* note 3.

---

**9.** This was the second reference Detective Aceto made to K.A.'s "compassion."

**10.** K.A. argues that his description of the guns cannot corroborate his confession as a matter of law "because an uncorroborated admission cannot corroborate another uncorroborated admission." The government contends, meanwhile, that K.A.'s "admission" concerning the guns' appearance was adequately corroborated by evidence that the guns actually appeared that way. We find it unnecessary, however, to address the distinction found in some case law between "confessions" and "admissions," both of which must be corroborated, *see Smith v. United States*, 348 U.S. 147, 155–56, 75 S.Ct. 194, 99 L.Ed. 192 (1954), except to the extent necessary to clarify that we consider K.A.'s statement "They my guns" to be the confession at issue that must be corroborated to sustain his conviction. *See Smith*, 348 U.S. at 156, 75 S.Ct. 194 ("All elements of the offense must be established by independent evidence or corroborated admissions...."). Without K.A.'s statement that the guns were "my guns," there would be no evidence to establish the possession elements of his charges. We also note that the potentially corroborating evidence at issue in this case is not K.A.'s statement describing the guns itself, but rather the evidence that his description of the guns was consistent with the guns that were found under his grandfather's mattress and that he claimed, in his confession, were his.

The quality of the corroborating evidence in this case is akin to that of *In re R.A.B.*, 399 A.2d 81 (D.C.1979), where this court reversed a juvenile's conviction for burglary and larceny. In *R.A.B.*, a police officer responding to a store's burglar alarm stopped the 12–year–old defendant, whom he had observed running in the area. *Id.* at 82. Aside from R.A.B.'s confession, the only evidence of his involvement in the crime was his presence in the vicinity and his flight. *Id.* at 83. The court held that the evidence was insufficient to support his guilt beyond a reasonable doubt because "proof of the presence of an individual at the scene of a crime cannot, without more, support a conviction of aiding and abetting its commission." *Id.* at 84. Similarly, K.A.'s knowledge of the guns' appearance supports only an inference that he was present with the person possessing the guns. While we "resolve all inferences in favor of the nonmoving party," *Bradshaw v. District of Columbia*, 43 A.3d 318, 324 (D.C.2012) (internal quotation marks and citation omitted), we cannot agree, under the circumstances surrounding K.A.'s confession, that mere knowledge of an item's appearance supported a reasonable inference of possession.

*Rachlin v. United States*, 723 F.2d 1373 (8th Cir.1983), upon which the government principally relies, is not analogous. In that case, Rachlin's attorney set up meetings with federal agents to discuss Rachlin's plea to passing a counterfeit bill. *Id.* at 1375. Rachlin made numerous admissions at these meetings, including that he passed a bogus bill at Woolf Brothers department store around a certain date, and he further cooperated in making recorded phone calls to his suppliers. *Id.* The Eighth Circuit found that Rachlin's admissions were adequately corroborated by (1) the detailed nature of his admissions, and (2) a bank teller's testimony that she discovered a counterfeit bill in a Woolf Brothers deposit made at the relevant time. *Id.* at 1379. The latter factor was relevant because "[i]t would be highly unlikely that Rachlin would know a counterfeit $100.00 bill was passed at Woolf Brothers . . . if he were not the person who passed it." *Id.* That is not the case here. K.A.'s confession is notable for its lack of detail. It is not unlikely that K.A. would know the colors and sizes of two guns that *someone else* possessed inside his home. And unlike K.A.'s situation, the circumstances under which Rachlin made his admissions instilled more confidence in the truth of the statements.[11]

K.A.'s knowledge of the guns' basic appearance is of particularly little value as corroborative evidence when compared with the kind of evidence the government could have presented—the kind other decisions have found to be substantial under *Opper.* The government deliberately prosecuted K.A. with "a statement case," instead of offering, for example, the testimony of any witnesses from the apartment or physical evidence such as fingerprints. *See Fowler v. United States*, 31 A.3d 88

---

11. The government also cites *United States v. Gresham*, 585 F.2d 103 (5th Cir.1978), to support its argument that corroborative evidence is sufficient when the defendant knew something there was "no other way" he would have known unless he committed the offense. *Id.* at 106. This case, too, is inapposite. K.A. was just as likely to know the guns' basic appearance if someone else possessed them as if he possessed them himself. Moreover, his knowledge does not begin to compare to the deep, detailed knowledge of the offense displayed by the defendant in *Gresham. See id.* at 104–05, 105 n. 1 (defendant knew the makes, models, years, owners, and license plate numbers of two stolen cars, the locations from which they were stolen, and where they were abandoned or surrendered, and described in detail his cross-country trips in the vehicles).

(D.C.2011) (defendant's confession to two murders made to friend was sufficiently corroborated by the testimony of numerous witnesses as well as ballistics evidence); *Naples,* 344 F.2d at 514 (holding that various items of physical evidence adequately corroborated defendant's confession). The police also did not press K.A. to confirm any other information that would have supported his confession, such as where in the apartment the guns were found, or their make, model, or caliber. K.A.'s statements thus were lacking in the detail that supported an inference of truth in the defendants' confessions in *Adams, Rachlin,* and *United States v. Gresham,* 585 F.2d 103 (5th Cir.1978). Finally, the government did not verify K.A.'s additional claims concerning the weapons, such as by locating the Dumpster behind which K.A. told Detective Aceto he found the guns. *See Adams,* 502 A.2d at 1023–24 (evidence "admitted to establish the overall accuracy of the diary" served to adequately corroborate defendant's confession).

Overall, the circumstances of K.A.'s case stand out among the prior decisions of this court addressing the corroboration rule— even those finding a lack of sufficient corroboration—in the extent to which they create a genuine skepticism regarding the truth of K.A.'s confession. *Cf. J.H.,* 928 A.2d at 652 (citing long string of cases and their basic facts).[12] Under these circumstances, the implication that K.A. had seen the guns before does not inject his statements with enough reliability to provide the factfinder with a trustworthy confession.

### III. Conclusion

While the corroboration rule does not require that the government prove all of the elements of the crime through independent evidence, *see Opper, supra,* it does require that the independent evidence be sufficient to make the confession worthy of an inference of truth. We begin our analysis, following *J.H.,* with the inherently unreliable circumstances of K.A.'s confession, produced amid a significant amount of police pressure and what we reasonably conclude was his desire to spare his visibly ill grandfather a criminal charge and a trip to jail. Because the corroborative evidence in this case was insufficient to make up this deficit of reliability and thus allow a conviction based solely on K.A.'s confession, we reverse and remand to the trial court with directions to enter a judgment of acquittal.

*So ordered.*

---

**12.** To the list of cases in *J.H.,* we add: *Fowler,* 31 A.3d 88, and *Wheeler v. United States,* 977 A.2d 973 (D.C.2009) (defendant's confession consisting of various statements made to friends over time was adequately corroborated by his motive, his anger at the victim, and his actions and demeanor surrounding the murder).