Argued November 19, 1976, affirmed January 24, reconsideration
denied March 1, petition for review denied April 12, 1977

## STATE OF OREGON, *Respondent,*
*v.*
## WILLIAM HENRY KELSEY, JR., *Appellant.*
## (No. CR 75-158, CA 6123)
558 P2d 1299

Robert J. McCrea, Eugene, argued the cause for appellant. With him on the brief was Morrow & McCrea, P.C., Eugene.

Melinda L. Bruce, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

THORNTON, J.

## THORNTON, J.

Defendant appeals from a conviction for murder assigning as errors the following: (1) admission into evidence of an alleged threat; (2) admission of the fingerprint identification of the victim; (3) admission of the testimony of Jean Kelsey, defendant's 'wife' by a void marriage; (4) the calling to the stand by the state of defendant's lawful wife, knowing that defendant would invoke the marital privilege against her testifying; and (5) the failure to give a requested instruction.

On June 17, 1975, local authorities found a badly decomposed and unidentified body in the Columbia River. On August 19, 1975, Jean Kelsey reported to the Hood River Sheriff's office that the defendant had killed a man named Rex Conway near the river. Fingerprints from the hands of the body found in the river were later identified by the FBI as the fingerprints of Leslie Rex Conway, aka Sven Richard Jorgensen.

Jean Kelsey, who had witnessed the murder, was the state's principal witness against defendant.

Testimony at trial revealed that defendant and Conway had a long-standing dispute over title to a 1965 Mustang and that on the night of May 29, 1975, defendant had lured the victim to a secluded location on the Columbia River bank, beaten him with a tire iron and forced him into the river.

During the direct testimony of Jean Kelsey, the following colloquy occurred without objection:

"Q Did the defendant ever suggest to you any other means of obtaining the title outside of what you described about something about a title transfer?

"A Just that he wanted the title, he didn't really specify.

"Q Did he ever discuss with you how he was going to go about getting the title outside of the title transfer?

"A Yes, he said he was going to scare Rex into giving him the title.

"Q  Did he tell you how he was going to scare Rex?

"A  Yes, he discussed one evening that he was going to set fire to the Webster cabins.

"Q  Will you give us the circumstances of that, Mrs. Kelsey?

"A  He had the cans of gasoline——"

At a later point in the trial, after an objection by defendant and offer of proof by the state, the following testimony of Darryl Clemmer was introduced:

"Q  (MR. SMITH) Mr. Clemmer, on any of these trips with the defendant in early May did you ever discuss the Webster Cabins?

"A  Yes.

"Q  What did the defendant say about the Webster Cabins?

"A  That there were Mexicans living in there and that he knew somebody that would pay to have the Mexicans burned.

"Q  How much, did he say?

"A  A hundred dollars.

"Q  Did you ever follow up this discussion by making any trips in the vicinity of the Webster Cabins?

"A  Yes, we went by the cabins but we never got close to them, it was a ways from them.

"Q  Did the defendant point out the Webster Cabins to you?

"A  Yes, I knew where they were at.

"Q  Did he point out the cabins he expected to be burned down?

"A  They were all one building.

"Q  How much did the defendant say would be paid for burning down the cabins?

"A  A hundred dollars.

"Q  Did you ever discuss with the defendant how the fire could be started?

"A  Yes.

"Q  How was suggested the fire be started?

"A  Gasoline.

"Q  Do you remember anything about discussion where the fire should be started?

"A  Yes.

"Q   Where did the defendant suggest the fire should be started?

"A   Well, there was different places mentioned and different techniques, but I can remember the laundry room as one.

"Q   What were the other techniques and places?

"A   Well, there was discussions of dynamite and going to different extents and everything, you know, sort of—a little more expensive.

"Q   Did the defendant ever discuss the fact that Rex Conway resided in those cabins?

"A   Yes.

"Q   During the period of time that you were discussing the possibility of burning them down?

"A   Yes.

"* * * * *

"Q   What did the defendant say about Rex Conway?

"A   That if something happened to him that it would be likely he wouldn't be noticed because he didn't have no near relatives.

"Q   Is that all the defendant said about Rex Conway?

"A   There were other discussions, but I can't remember them enough to testify to it."

Defendant argues that Clemmer's testimony should have been excluded because the general rule[1] that threats against a particular class of persons are admissible in a prosecution for killing a member of the particular class indicated in the threats is inapplicable here because the threat to which Clemmer testified was a threat against Mexicans, a class that did not include the victim. We think that the threat was also to persons living in the Webster Cabins, a class which included the victim. The testimony was therefore relevant to show premeditation and intent. *State v. Meyers,* 57 Or 50, 110 P 407 (1910). To the extent that the statement can be said to have been offered to prove the truth of the matter asserted, i.e., as a threat to a

---

[1] *State v. Klamert,* 253 Or 485, 455 P2d 607 (1969); *State v. Meyers,* 57 Or 50, 110 P 407 (1910); 1 Wharton, Criminal Evidence 414, § 201 (13th ed Torcia ed 1972); 1 Wigmore, Evidence 539, § 106 (3d ed 1940).

group which included the victim, it falls within the admission exception to the hearsay rule. *State v. Weston,* 102 Or 102, 201 P 1083 (1921).

■ Defendant also objects to the admission into evidence of copies of fingerprint cards from FBI microfilm records used to identify the victim, contending that they are inadmissible as official records, ORS 43.370, or business records, ORS 41.690.

Prior to trial an omnibus hearing was held on the admissibility of the fingerprint records. The trial court ruled that this kind of document is admissible as a business record if a proper foundation is laid at trial. At trial the state introduced testimony from an FBI fingerprint specialist and introduced three sets of matching prints: one set was identified as the prints of Sven Richard Jorgensen, another set as those of Leslie Rex Conway and a third set from the hands of the previously unidentified body. Arguably no proper foundation for the introduction of the fingerprint records as business records or as official records was laid at trial. But *see, State v. Miller,* 79 NM 117, 440 P2d 792 (1968). While defendant did object at trial to the order of the admission of the fingerprint records, when the order of the offered cards was reversed, defendant expressly stated that he had no objection to the introduction of the evidence. He therefore waived any objections he might have to the foundation for the admission of the fingerprint records. *Hutchison v. Semler et al,* 227 Or 437, 361 P2d 803, 362 P2d 704 (1961). *See also, Edgren v. Reissner,* 239 Or 212, 396 P2d 564 (1964).

■ Defendant next objects to a trial court ruling allowing the testimony of Jean Kelsey on the ground that, although her marriage to defendant which was concededly bigamous and therefore void, the trial court failed to determine whether the marriage was in "good faith" and the marriage had not been annulled.

A bigamous or otherwise void marriage will not

support a claim of marital privilege. 8 Wigmore, Evidence 223, § 2230 (McNaughton rev 1961); McCormick, Evidence 167, § 81 (2d ed E. Cleary 1972); *People v. Mabry,* 71 Cal2d 430, 78 Cal Rptr 655, 455 P2d 759 (1969), *cert denied* 406 US 972 (1972).

■ Defendant's remaining objections are less substantial. The fact that the prosecution called the defendant's wife, presumably aware that she would invoke the marital privilege, was not reversible error. *State v. Dennis,* 177 Or 73, 159 P2d 838, 161 P2d 670 (1945).

■ We find no support in the record for defendant's assertion that Jean Kelsey was an accomplice to the crime. There was no credible evidence that when she accompanied defendant to the scene of the crime she knew that he would assault the deceased and no evidence that, after they arrived at the scene, she participated in the crime charged. The requested instruction requiring corroboration of her testimony was, therefore, properly refused.

Affirmed.