**Rufus E. ADAMS, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 82–858, 82–1153.

District of Columbia Court of Appeals.

Argued Dec. 7, 1984.

Decided Jan. 7, 1986.

Mark S. Carlin, Public Defender Service, with whom James Klein, Washington, D.C., was on brief, for appellant.

Maria E. Beardell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Steven D. Gordon, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and NEBEKER and BELSON, Associate Judges.

BELSON, Associate Judge:

Appellant was charged in a six count indictment with first-degree murder (premeditated murder) while armed, D.C. Code §§ 22–2401 (1981), –3202 (1981) (amended 1983), two counts of first-degree murder (felony murder) while armed, *id.* §§ 22–2401, –3202, armed robbery, *id.* §§ 22–2901, –3202, and two counts of sodomy, *id.* § 22–3502, all incident to the death of Alfreda Garner. A jury found appellant guilty on all counts in the "merits" phase of a bifurcated trial. Subsequently, in the "insanity" phase, the same jury returned verdicts of guilty on counts 1 to 5 and not guilty by reason of insanity on count 6, charging sodomy. Appellant was committed to Saint Elizabeth's Hospital and, upon his release, was sentenced to an aggregate term of 45 years to life incarceration. This is a consolidated appeal from the convictions on counts 1 to 5 and from the trial court's order releasing appellant from his hospital commitment. For the reasons discussed herein we remand this case for resentencing; in all other respects we affirm.

I

On October 22, 1980, Metropolitan Police officers were summoned to an apartment building at 704 Third Street, N.W., after residents complained of an odor emanating from the basement area. The police discovered the decaying body of a woman. The body was nude save for stockings and shoes and was lying face down with the arms flexed beneath it, the legs spread, and the hips elevated. Blood was smeared over the back, arms, buttocks and thighs, and had trickled onto the floor. The body bore numerous stab wounds to the chest, arms and hands plus a five-inch horizontal laceration of the neck. A pink pantsuit and a black blouse with a bow were piled next to the decedent's head. No money, no purse and no jewelry, save a ring, were found on or near the body. The clothes later were identified by decedent's friend, Beverly Butler, as the outfit Alfreda Garner had worn on October 16, 1980. Butler

was aware that Alfreda Garner had become a prostitute, and that she sometimes used the name "Rita." A fingerprint analyst established that the body was, indeed, that of Alfreda Garner.

Upon investigation of Garner's apartment, the police found a handwritten note bearing the inscription "Kevin" and "call Thursday" followed by a telephone number. The number was established to be an unpublished number listed to appellant at 704 Third Street, N.W., the building in which Garner's body had been discovered. Appellant had assumed the alias, "Kevin."

Detectives from the Metropolitan Police Department obtained a search warrant and went to appellant's apartment. When the detectives arrived appellant consented to the search of the premises. One detective found on a desk a yellow sheet of paper that appeared to be a page from a diary. He inquired of appellant who indicated he was keeping a diary. On request appellant produced three sets of papers, dated and in chronological order, among the last of which was one page dated October 16, 1980. It mentioned that "Rita" had been to his apartment that evening. Nevertheless, appellant denied knowing any young woman named Rita and denied knowing Alfreda Gardner when shown her picture. He later admitted in a written statement that he knew several women named Rita and explained that the Rita mentioned in his diary referred to a Rita Dark.

The detectives seized the several hundred page diary as well as some items recovered from a footlocker near appellant's bed including some pornographic materials, a razorblade, a boxcutter with a retractable razorblade, and a garrotte.[1] Also seized from appellant's footlocker, but excluded by the court, were a pair of women's underpants, a lubricated water nozzle,

a curved steel spike blade and additonal pornographic materials.

The medical examiner who performed an autopsy on Garner's body estimated the time of death to be some time before October 19, 1980. The neck wound was consistent with that which could be caused by an ineffectively applied garrotte. That wound, according to the medical examiner, was not lethal; the decedent's heart had still been beating when she was stabbed. The chest wounds probably had been caused by a knife and the hand wounds by a boxcutter or knife. On the basis of various pieces of evidence, the medical examiner deduced that Garner had been wounded in another place, covered with some type of cloth and then moved to the anteroom. The position of the body when found was consistent with anal sodomy having been performed on it, although advanced decomposition precluded testing for medical evidence of such an act. The medical examiner attributed the cause of Garner's death to the cumulation of injuries and ensuing bleeding; he classified her death as a homicide.

**II**

What the government has referred to as the linchpin of its case against appellant was the voluminous diary recovered from appellant's apartment. The diary comprised a 530–page handwritten detailed chronicle of events occurring in appellant's life from January 26, 1979 to October 26, 1980. Most significant of all were the diary entries for October 16, 1980, the last day on which Garner was seen alive, and for the morning of October 17. These diary entries, which included sunburst symbols denoted by asterisks, read in relevant part:

Thur. Oct. 16, 1980 . . .

Then I ran into Rita/we rap catch a cab to my place/ Rita etc/*/I got

---

1. At trial a police officer, qualified as an expert in the field of martial arts and exotic weapons, described a garrotte as a length of thin wire attached at each end to a handle. It is a weapon employed for stealthful attack on the neck from the rear either to strangle or to decapitate the victim. The garrotte recovered from appellant's apartment contained a wire that was too long to be used effectively. Notches on its wood handles, caused by pressure from the wire, indicated that the garrotte had been used previously.

$50.00/time is 11:30 pm/I start cleaning up/No eyes/but Shorty-Miss Chink—dude next door—Diana and Mrs. Briscoe all heard noises/time now is 1:30 am/I update all reports....

Fri. Oct. 17, 1980

After a lot of effort/I could not out/to bed at 5:15 am/sore/I rubbed down/up at 9:30 am/at 4:33:30 am*/a good session....

Using these two entries, together with considerable circumstantial evidence, the government ultimately was able to establish that appellant had murdered, robbed and twice sodomized Alfreda Garner. To prove its case the government relied on documentary evidence contained elsewhere in the diary as well as on testimonial evidence from a psycholinguistics expert, Dr. Murray Miron, and from lay witnesses including two persons with whom appellant had had intimate relationships, Lynette Vessells and Anthony Williams.

**A.**

Appellant challenges the admission of diary entries reporting sexual encounters with Williams and Vessells, and their corresponding testimony. Some of the diary entries contained the sumburst symbol which appeared in the above-quoted passages. Both the entries and the testimony referred explicitly to episodes of anal intercourse. Appellant contends that the trial court erred in admitting this evidence under the "unusual sexual preference" exception to the general rule proscribing admission of evidence of other criminal acts, independent of the ones charged, that tends to prove criminal disposition, *Calaway v. United States*, 408 A.2d 1220, 1227 n. 12 (D.C.1979).

Appellant argues that the unusual sexual preference exception applies, in this jurisdiction, only to previous sex acts between the same persons, that is, a complainant and the defendant, citing *Fairbanks v. United States*, 96 U.S.App.D.C. 345, 226 F.2d 251 (1955). We observe, however, that *Fairbanks* does not support appellant's argument, as the holding there was that evidence of the cited previous behavior was inadmissible because the behavior was not the same as or similar to the charged conduct. More important, and fatal to appellant's argument, is the fact that this court extended the exception to include acts committed with or against persons other than the present complainant or victim. *Dyson v. United States*, 97 A.2d 135, 137–38 (D.C.1953).

■ Appellant argues further that the acts described by Williams and Vessells were not "unusual" in the sense in which that word is used in this context. We need not detain ourselves with discussion of that issue, however, for the evidence was clearly admissible on another basis.[2] The disputed diary entries and the testimony of Anthony Williams and Lynette Vessells were highly relevant to the interpretation of the sunburst symbols appearing in appellant's diary on October 16 and 17, 1980.[3]

---

2. This court may affirm a decision for reasons other than those given by the trial court. *Purce v. United States*, 482 A.2d 772, 775 n. 6 (D.C. 1984); *Ibn-Tamas v. United States*, 407 A.2d 626, 635–36 (D.C.1979).

3. We recognize that the evidence in dispute here does not fit squarely into any one of the five exceptions enumerated in *Drew v. United States*, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). The identity exception offers the closest fit. Under this exception,

if the facts surrounding the [other crimes and the crime on trial] show that there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed, the evidence of one would be admissible in the trial of the other to prove identity.

*Id.* at 16, 331 F.2d at 90 (footnote omitted); *see Brooks v. United States*, 448 A.2d 253, 257 (D.C. 1982); *Evans v. United States*, 392 A.2d 1015, 1020 (D.C.1978). "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." McCORMICK ON EVIDENCE § 190, at 449–50 (E. Cleary, 2d ed. 1972). The "signature" in the instant case, however, derives not so much from the manner in which the sodomies were committed as from the distinctive sunburst symbol appellant used to signify the offenses in his diary.

The court in *Drew* acknowledged that its "list is not necessarily all-inclusive." 118 U.S.App.

The symbols in those key entries provided the only direct proof of the sodomy charges. The documentary and testimonial evidence regarding appellant's sexual encounters with Anthony Williams and Lynette Vessels established a correspondence between appellant's use of the sunburst symbol in his diary and his acts of anal sodomy. By the same token, the evidence furnished valuable corroboration for Dr. Miron's expert opinion that the sunburst symbol represented anal sodomy wherever the symbol appeared in the diary, including the entries for October 16 and 17.[4]

Moreover, the evidence pertaining to Vessells and Williams was vital to establish that the diary accurately reported the nature and timing of appellant's sexual encounters. The government bore the burden of authenticating the diary, *United States v. Sutton*, 138 U.S.App.D.C. 208, 212–14, 426 F.2d 1202, 1206–08 (1969); McCormick on Evidence §§ 218, 222, and of adducing substantial independent corroborative evidence of the meaning of the cryptic symbols contained in it, *see infra*, Part IV. At trial, appellant maintained that the document was not a diary but rather a "manuscript" which reflected "a certain amount of imagination, a certain amount of fancy" and which was "not … to be taken literally." It therefore was

incumbent on the government to establish the accuracy of the diary, in general, and of the inculpatory symbols, in particular.[5] The testimony of Vessells and Williams closely tracked appellant's corresponding diary entries and thus was highly probative of the accuracy with which appellant recorded his activities, most significantly those of a sexual nature.

While the evidence regarding appellant's sexual encounters with Anthony Williams and Lynette Vessells was highly probative of the significance of the sunburst symbols, it was also undoubtedly prejudical to appellant. The determination whether the prejudical effect outweighed the probative value requires a balancing process that is committed to the discretion of the trial court. *Bigelow*, 498 A.2d at 214; *Gates v. United States*, 481 A.2d 120, 123–24 (D.C. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). In light of both the importance of ascertaining the meaning and accuracy of the sunburst symbols as well as the relevance of the contested evidence with respect to that issue, we perceive no abuse of discretion in the admission of the evidence. *See Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90.[6]

### B.

Appellant next challenges the admission of a diary entry from October 2, 1980, that

---

D.C. at 16 n. 10, 331 F.2d at 90 n. 10. Exceptions to the general rule excluding evidence of other crimes may be permitted where "that evidence can be admitted for some substantial, legitimate purpose." *Id.* at 16, 331 F.2d at 90 (footnote omitted); *Tinsley v. United States*, 368 A.2d 531, 533 (D.C.1976). Elucidation of the meaning of the sunburst symbol constitutes such a purpose here.

4. The fact that Dr. Miron was allowed to offer his expert opinion on the meaning of the sunburst symbol did not, as appellant contends, obviate the need to put before the jury diary entries containing the symbol. The entries established the factual foundation for Dr. Miron's testimony. Ultimately it was not for Dr. Miron but rather for the jury with the aid of Dr. Miron to draw inferences from the evidence and to determine the facts. It was necessary that the jury be presented the diary entries so it might reach its own conclusion as to the meaning of the symbols.

5. Other crimes evidence is admissible only if it is directed to a genuine and material issue in the case and is probative of that issue; whether an issue is material is determined, in part, by the defense presented. *Bigelow v. United States*, 498 A.2d 210, 213 (D.C.1985); *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979). Because appellant premised his case on the argument that the document was a manuscript and not a diary, the accuracy of the document became a material issue to which other crimes evidence properly could have been directed.

6. Appellant raises the same argument with respect to admission of two diary entries containing the sunburst symbol and the phrase "I did my thing" and describing anal intercourse with a prostitute and someone named "Carlos." Those entries too were admissible to corroborate Dr. Miron's interpretation of the entries relating to Alfreda Garner.

referred to appellant's stalking of women other than Garner. The entry was admitted to prove the premeditation and deliberation elements of first-degree murder that were the government's burden to prove. *Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979). Appellant argues that the government's theory—that appellant had developed a preconceived design to kill, as evinced by the references to stalking of women—does not harmonize with the government's further theory that appellant killed Garner because she learned his identity.[7] We find no necessary inconsistency.

 The government maintained at trial that the October 2, 1980, passage showed that appellant had premeditated and deliberated about killing prior to encountering an appropriate victim; Garner became the object of appellant's preconceived plan when she discovered his true identity a few days before her death. The fact that the evidence about stalking referred to women other than Garner, appellant's actual victim, does not negate its probative value. In a case of first-degree murder, such as this one, the elements of premeditation and deliberation may be established by evidence of the accused's hostile purpose directed towards a class of persons of which the victim is a member. *See Balentine v. State,* 339 So.2d 1063, 1070 (Ala.Crim.App.1976) (in first-degree murder prosecution, no error in allowing evidence that appellant had sought out, and expressed plans to kill, two members of a class of persons that appellant thought were involved in death of his father, where victim was class member), *cert. denied,* 339 So.2d 1070 (Ala.1976); *see also State v. Bean,* 265 N.W.2d 886, 890 (S.D.1978) (prosecution for attempted murder; "jury could very well have concluded from defendant's statement that he would shoot the first police officer that came through the door that defendant did in fact have the premeditated design to take the lives of the police officers"); *State v. Kelsey,* 28 Or. App. 255, 259–60, 558 P.2d 1299, 1301–02 (1977) (in murder prosecution, evidence of threats by accused against a class of persons of which victim was member was relevant to show premeditation and intent, and therefore was admissible). *See generally* 1 C. TORCIA, WHARTON'S CRIMINAL EVIDENCE, §§ 201, 203 (13th ed. 1972) (threat against class of persons is relevant and admissible, even though victim not expressly identified, when victim is member of a threatened class). While evidence of this sort must be scrutinized carefully by the trial court because of its potential for injecting undue prejudice into the trial, we are satisfied that under the particular facts of this case, the trial judge did not abuse his discretion in admitting the evidence on the issue of premeditation and deliberation.

**C.**

 Appellant challenges, again as inadmissible evidence of other crimes, the introduction from his diary of 22 instances in which he recorded certain aspects of his sexual encounters. The entries tended to show that each time appellant engaged in sex he meticulously reported the act, his (or his partner's) departure thereafter, how much money he spent on food, transportation and gifts, and, in the event his partner was a prostitute, the sum of money he paid his partner. The evidence was admitted to demonstrate a pattern of conduct from which appellant clearly deviated on the night of the murder. By contrast with the prior 22 entries, the entry for October 16 about "Rita" did not document the sum of money he spent on her nor mention her departure. This omission, together with the statement, "I got $50.00," supports an inference that "Rita" never left appellant's apartment alive and that he never paid her, but rather that he robbed and killed her.

We think the evidence was properly admissible to elucidate the meaning of the

7. Appellant used the pseudonym, Kevin. In his diary entry for October 12, 1980, just a few days before the killing, appellant wrote that "I discov- ered that Rita may know my real name because an ad for some novels was in plain view on my dresser which I overlooked."

crucial diary entry for October 16. Furthermore, the potentially inflammatory impact of the twenty-two entries was diminished appreciably by the court's ruling restricting the scope of the evidence as read to the jury to exclude the often-times graphic descriptions of appellant's sexual episodes. With respect to all but three of the twenty-two entries,[8] testimony was limited to a summary consisting of the dates of appellant's sexual encounters, whether and how much his partners were paid, and whether there was a record of his or his partners' departure. Our review of the record satisfies us that the trial court properly exercised its discretion in admitting the disputed evidence.

### D.

■ Appellant also contends the court erred by admitting into evidence the diary in its entirety. Appellant agrees that the entries for October 11 to 26, 1980—reporting his interactions with "Rita Wms," the crimes with which he was charged, his subsequent efforts to cleanse his apartment, and his thoughts and actions evincing consciousness of guilt—were admissible. He contends that previous portions of the diary, however, were highly prejudicial. Entries for January to October, 1979, written while appellant was incarcerated for prior convictions, referred repeatedly to his imprisonment at Lorton Reformatory. Later entries mentioned his recent incarceration and his parole status. Many entries, other than those otherwise admitted, explicitly described appellant's participation in a wide variety of illegal sex acts with men as well as with women. Appellant contends that admission of the whole diary was highly prejudicial insofar as its effect was to portray him as a "sex fiend." We disagree, and hold that the trial judge's ruling in this regard was not an abuse of discretion.

Prior to trial, the court heard extensive argument about the admissibility of the diary. The court ruled that the January-October 1979 entries, written during appellant's incarceration at Lorton, should be excluded, as should any subsequent references to Lorton or to appellant's parole. With respect to the portion of the diary that related to the period following October of 1979, the defense was instructed to make specific objections to any portions it asserted to be inadmissible. During trial, at a bench conference preceding the testimony of the government's handwriting expert who was to read portions of the diary to the jury, appellant requested the court to admit from the excluded portion of the diary selected entries referring to a person named Rita. It was appellant's contention that these early references to Rita, recorded long before Alfreda Garner became a prostitute and assumed that pseudonym, would refute the government's theory that the Rita mentioned in the diary entries of October 1980 was Alfreda Garner.

The government responded that, if these earlier references were admitted, it would need the entire Lorton portion of the diary to establish the context in which the name Rita appeared in order to show that the object of the earlier references was not the Rita of the October 1980 entries. Appellant maintained that admission of the entire diary was unnecessary to accommodate the government's concerns and would pose a formidable task of redaction. He suggested that those concerns could be satisfied by admission of only those diary entries containing references to Rita. The court indicated that if appellant chose to inquire about the earlier references to Rita, it would withdraw its previous ruling excluding the Lorton portion of the diary. Acknowledging the risk of his decision, appellant opted to pursue his cross-examination and requested the court to vacate the ruling of exclusion. The court obliged. Appellant proceeded to elicit testimony about

---

8. Two entries were admitted in their entirety before appellant's counsel registered an objection that precipitated the court's ruling restricting the scope of the testimony. A third particu-larly graphic entry was admitted on the ground that it was probative of the meaning of the phrase, "I did my thing," which appeared later in the diary with reference to "Rita Wms."

diary references to the name Rita dating back to February and April, 1979, while appellant was residing at Lorton.

The court heard further argument about admissibility of the diary at the close of the government's case. Appellant declared that he had no objection to admission of diary entries that had been the subject of testimony, including a so-called red notebook containing the transcribed diary entries about Anthony Williams, Lynette Vessells and the twenty-two sexual encounters admitted to establish appellant's pattern of conduct.[9] Appellant did object, however, to admission of the rest of the diary. In support of his objection appellant stressed that the diary bore references to Lorton and parole, which he contended were too numerous to sanitize, references to assaultive conduct on a woman named Tonya, and numerous references to other sexual encounters.

The government countered that the jury needed to view the diary for two reasons: to determine whether appellant had exhibited a consistent pattern of conduct in his sexual encounters from which he deviated on the night of the murder; and to understand that the Rita whom appellant discussed in his earlier diary entries was someone he met at Lorton. The court admitted the entire diary into evidence with instructions to counsel to sanitize references to Lorton, parole, and appellant's criminal record.

At the close of jury instructions, the court again instructed counsel to commence redaction of the excluded references. Later, appellant and the government together proposed that, in lieu of sanitization, the document be submitted to the jury, upon its request, with a cautionary instruction. Additionally, appellant specifically objected to references to masturbation, assaults on Tonya, and certain other entries. The government agreed to sanitize all such objectionable references. The court subsequently submitted the diary to the jury with a cautionary instruction prepared and agreed to by appellant and the government.

Appellant concedes that he opened the door by eliciting testimony about diary references to a person named Rita which appeared in the portion of the diary the court previously excluded. He agrees with the government's argument that once he introduced evidence from the excluded part of the diary, it would have been unfair to deny the government the means to rebut his intended reference that the "Rita Wms" referred to in the diary between October 12 and 16, 1980, was not Alfreda Garner. Where appellant and the government part company is over the question of degree. Appellant contends that the trial court allowed the door to open far wider to rebuttal than necessitated by appellant's introduction of previously excluded evidence. We are not persuaded that, under the circumstances, the court abused its discretion.

When appellant made the tactical decision to put in evidence of two diary references to a "Rita" made during the time appellant was at Lorton, he knew he ran the risk of the admission of the entire diary for the Lorton period. He must be held to have known also that, at the very least, any exploration of the circumstances surrounding those references to Rita would reveal that appellant was at Lorton, thus suggesting that he had some unspecified criminal record.

We are satisifed that the admission of the entire diary caused appellant no significant incremental prejudice by reason of the diary references to Lorton over that which necessarily attended his tactical choice to bring out the fact of the entries regarding Rita. Moreover, the court repeatedly instructed the parties to see to the redaction

---

9. It is not clear whether appellant merely intended to be accommodating by noting no objection to diary entries regarding oral testimony to which he had earlier objected, or whether he waived his previous objections. Since the government has not asserted a waiver, we have given appellant the benefit of the doubt and proceeded on the basis that there was no waiver.

of references to Lorton, parole, and the indications of a criminal record. Appellant chose not to redact but to rely on a cautionary jury instruction.

The other prejudice that appellant might have suffered by admission of the entire diary would have flowed from its repeated references to appellant's sexual activities. The jury, however, had already become aware of appellant's sexual behavior, and any additional impact should have been slight.

There was, on the other hand, as the government argued, legitimate and probative use of the balance of the diary, albeit a use that could have been substantially realized by admission of less than the whole. The matter before the trial judge was, in essence, a decision whether to admit the whole of a series of documents upon the request of a party whose adversary has offered but a portion.[10] The judge was required to strike the familiar balance between the danger of prejudice and explanatory value. Given all the circumstances here, including especially the offer of redaction and the cautionary instruction, we find no error.

### III

Appellant's next contention is that the trial court erred in admitting the testimony of Dr. Murray Miron, the government's psycholinguistics expert, regarding the meaning of the sunburst symbol. The government theorized that the symbol represented anal sodomy. Appellant argues that the subject of this testimony did not lend itself to expertise and that, even if it did, Dr. Miron was not qualified to give an expert opinion on the matter.

This court has adopted a three-part test for admissibility of expert testimony:

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; (2)

the witness "must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

*Dyas v. United States,* 376 A.2d 827, 832 (D.C.) (quoting McCormick § 13 at 29–31 (E. Cleary, 2d ed. 1972), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977)) (emphasis omitted); *accord Hawkins v. United States,* 482 A.2d 1230, 1232 (D.C.1984); *Taylor v. United States,* 451 A.2d 859, 867 (D.C.1982), *cert. denied,* 461 U.S. 936, 103 S.Ct. 2105, 77 L.Ed.2d 311 (1983); *Brooks v. United States,* 448 A.2d 253, 258 (D.C.1982); *Ibn-Tamas v. United States,* 407 A.2d 626, 632–33 (D.C.1979). The decision whether to admit or exclude expert testimony is vested in the broad discretion of the trial judge, whose ruling must be sustained unless manifestly erroneous. *Harris v. United States,* 489 A.2d 464, 470 (D.C.1985); *Taylor,* 451 A.2d at 866; *Brooks,* 448 A.2d at 258. It is also in the trial court's discretion to determine, as with any evidence, whether the probative value of the expert testimony outweighs its potentially prejudicial impact. *Harris,* 489 A.2d at 470; *see Ibn-Tamas,* 407 A.2d at 632; *Middleton v. United States,* 401 A.2d 109, 131 (D.C.1979). This court's scope of review respecting rulings on admission of expert testimony, accordingly, is narrow. *Douglas v. United States,* 386 A.2d 289, 295 (D.C.1978) (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)), *quoted in Ibn-Tamas,* 407 A.2d at 632.

Expert testimony is not "beyond the ken of the average layman," *Dyas,* 376 A.2d at 832, "[w]here the jury is just as competent as the expert to consider and weigh the

---

**10.** McCormick on Evidence § 56 at 130–31 (E. Cleary, 2d ed. 1972); C.J.S. Evidence §§ 190, 774 (1964).

evidence and draw the necessary conclusions ...." *Lampkins v. United States*, 401 A.2d 966, 969 (D.C. (1979) (citing *Waggaman v. Forstmann*, 217 A.2d 310, 311 (D.C.1966)); *Ibn-Tamas*, 407 A.2d at 632; *Middleton*, 401 A.2d at 130 n. 43. Under such circumstances, admission of the expert's testimony would invade the province of the jury as trier of fact and, thus should be excluded. *Ibn-Tamas*, 407 A.2d at 632; *Lampkins*, 401 A.2d at 969 (quoting *St. Louis v. Firestone*, 130 A.2d 317, 319 (D.C. 1957)). In other words, the jury may evaluate the facts without expert assistance if the facts are " 'within the realm of common knowledge and everyday experience.' " *District of Columbia v. White*, 442 A.2d 159, 164 (D.C.1982) (quoting *Matthews v. District of Columbia*, 387 A.2d 731, 734–35 (D.C.1978)). Conversely, an expert's testimony is admissible if it "provide[s] a relevant insight which the jury otherwise could not gain in evaluating" the evidence. *Ibn-Tamas*, 407 A.2d at 633.

■ We do not think that the deciphering of a cryptic symbol appearing occasionally throughout a several hundred page handwritten document is a matter within the common knowledge or everyday experience of the average juror. The meaning of such a symbol is not one which a layperson, without the assistance of a qualified expert, would readily perceive from the document itself. *See Ibn-Tamas*, 407 A.2d at 633.[11]

Appellant insists, however, that Dr. Miron himself as much as conceded that the jury was as capable as he of fathoming the import of the sunburst symbol. Dr. Miron testified that the analytic technique he used to interpret the symbol—gleaning its meaning from its usage in the several contexts in which it appeared—was fundamentally the same as the approach any conscientious layperson would be expected to

take. We read these remarks as nothing more than an attempt by Dr. Miron to explain in comprehensible terms the theory underlying his technique. This is evident in light of the method Dr. Miron actually used to apply his analytic technique to the interpretive task in this case. Dr. Miron first read the diary in its entirety and then extracted from it thirty-two occurrences of the sunburst symbol and the text in which they appeared. He entered the symbols and corresponding passages into a computer which organized the data according to contextual similarities. Finally, Dr. Miron applied his training and experience to ascertain whether the contextual similarities were indicative of the symbol's meaning. Ultimately he concluded, with a reasonable degree of scientific certainty, that the symbol signified anal sodomy.

■ We are persuaded that none but the most diligent and persevering of juries would be capable of undertaking the painstaking contextual analysis required to decipher the sunburst symbol and, if it did, of reaching a conclusion with any significant degree of confidence. Of course, it is a principal purpose of expert testimony to prevent the jury from engaging impermissibly in idle speculation. *District of Columbia v. Freeman*, 477 A.2d 713, 719 n. 19 (D.C.1984) (citing *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C.1981)). Even were we to assume, as appellant urges, that the jury may have had *some* competence in detecting the meaning of the sunburst symbol, that fact alone would not compel us to overrule the trial court's determination about admission of Dr. Miron's testimony. *See Ohio Valley Construction Co. v. Dew*, 354 A.2d 518, 523 (D.C.1976). For it is only where "the jury is *just as* competent as the expert to consider and weigh the evidence and draw the necessary

---

**11.** It has been said that " '[c]onduct innocent in the eyes of the untrained may carry entirely different "messages" to the experienced or trained observer.' " *United States v. Jackson*, 138 U.S.App.D.C. 143, 145, 425 F.2d 574, 576 (1970) (quoting *Davis v. United States*, 133 U.S.

App.D.C. 172, 174, 409 F.2d 458, 460, *cert. denied*, 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969)), *quoted in Lampkins*, 401 A.2d at 968 (expert testimony regarding modus operandi of pickpockets). We think the same holds true here.

conclusions [that] the need for expert testimony evaporates." *Lampkins*, 401 A.2d at 969 (citing *Waggaman*, 217 A.2d at 311) (emphasis added); *Ibn-Tamas*, 407 A.2d at 632. We find no manifest error in the court's implicit determination that the subject of Dr. Miron's testimony was "beyond the ken of the average layman."[12]

Appellant also asserts that Dr. Miron lacked the requisite expertise to render an opinion about textual analysis of a cryptic symbol. Our view of the record satisfies us that Dr. Miron had ample experience in the interpretation of cryptic or symbolic text to offer his opinion in this case. Therefore, we discern no abuse of discretion in the trial judge's decision to admit his testimony.

## IV

■ Appellant next assigns as error the trial court's denial of his motion for a judgment of acquittal on the count of sodomy that allegedly occurred before the decedent's death, and the count of felony-murder (sodomy) while armed. Appellant argues there was insufficient evidence corroborating his admission, represented by the sunburst symbol appearing in the diary entry for October 16, 1980, that he committed anal sodomy. We find this claim belied by the record and consequently we uphold the trial court's refusal to order an acquittal.

It is a well-established rule that "a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488–89, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963); *Smith v. United States*, 348 U.S. 147, 152–53, 75 S.Ct. 194, 197–98, 99 L.Ed.2d 192 (1954); *Opper v. United States*, 348 U.S. 84, 89–91, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954); *In re R.A.B.*, 399 A.2d 81, 83 (D.C.1979).[13] The purpose of the rule is to forestall convictions based on extrajudicial confessions the reliability of which is a matter of suspicion.[14] As to the quantum of corroboration that must accompany the admission in order to provide an adequate basis for conviction, this court has followed the test enunciated in *Opper*:

> [C]orroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement....

**12.** We reject appellant's argument that Dr. Miron improperly testified to an ultimate fact. This court has held that an expert who speaks too directly to the ultimate issue (i.e., guilt or innocence), may, under certain circumstances, impermissibly preempt the jury's function. *Ibn-Tamas*, 407 A.2d at 632; *Lampkins*, 401 A.2d at 970. Dr. Miron, however, expressed no opinion on the ultimate issue of whether appellant unlawfully sodomized Alfreda Garner on October 16 and 17. Rather, Dr. Miron merely testified that the sunburst symbol in appellant's diary entries for those dates represented anal sodomy. Whether appellant was innocent or guilty was a question that remained for the jury to determine based on its evaluation not only of the expert testimony but also of the evidence of the authenticity and accuracy of the diary entries, the independent evidence linking appellant to Garner, and the evidence corroborating the meaning of the sunburst symbol.

**13.** It has been said that "[c]onfessions are admissions of the crime itself," while "[a]dmissions, so-called, concern only some specific fact which, in turn, tends to establish guilt or some element of the offense." *Jones v. United States*, 111 U.S.App.D.C. 276, 280, 296 F.2d 398, 402 (1961), *cert. denied*, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962). Because the corroboration requirement applies both to confessions and to admissions, we shall use the terms interchangeably for purposes of this discussion. *Opper*, 348 U.S. at 90–91, 75 S.Ct. at 162–63.

**14.** In *Opper*, the Supreme Court explained:

> In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration of weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination.

348 U.S. at 89–90, 75 S.Ct. at 162–63.

It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*Harrison v. United States*, 281 A.2d 222, 224–25 (D.C.1971) (quoting *Opper*, 348 U.S. at 93, 75 S.Ct. at 164).[15] Alternatively stated, "the adequacy of corroborating proof is measured not by its tendency to establish the corpus delicti but by the extent to which it supports the trustworthiness of the admissions." *United States v. Johnson*, 191 U.S.App.D.C. 193, 195–96, 589 F.2d 716, 718–19 (1979).

We are satisfied that appellant's admission about the first act of sodomy for which he was charged has been substantiated adequately under this test.[16] Several lines of proof tend to confirm the reliability of the admission. The first is the corroborated admission of the second sodomy.[17] That admission, reflected in the sunburst symbol appearing in the October 17, 1980, diary entry, was corroborated by the medical examiner's testimony, supported by photographs, that the decedent's body was found lying in a position consistent with anal sodomy having been performed on it.

Further corroboration of the first act of sodomy was furnished by appellant's admission of earlier acts of sodomy represented by the sunburst symbol.[18] The testimony of Anthony Williams and Lynette Vessells as well as that of Dr. Miron established that the symbol, wherever it appeared in the diary, meant anal sodomy.

A third line of corroboration consists of the diary entry for October 12, 1980, and extrinsic evidence concerning the decedent Garner on October 16, 1980. The October 12 entry reported a sexual encounter with "Rita Wms" thereby establishing a link between appellant and Garner of an intimate nature. The extrinsic evidence included the note found in Garner's apartment, bearing appellant's phone number and a reminder to call "Kevin" on Thursday; testimony that Garner was last seen alive on the evening of Thursday, October 16, 1980, wearing the same clothing later found next to her body, and the fact that Garner was found dead in appellant's apartment building. This evidence all helped substantiate appellant's identity as the perpetrator as well as the time, date and location of the crime.

Finally, evidence was admitted to establish the overall accuracy of the diary (e.g., rent receipts and hospital records corresponding to diary entries reporting pay-

---

**15.** *See also Smith*, 348 U.S. at 156, 75 S.Ct. at 199 ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.")

**16.** Informing our analysis is the fact that the admission of the sodomy consists of a sunburst symbol inscribed in appellant's diary entry for October 16, 1980. The admission was made incident to the crime, prior to any police investigation, and therefore was free of external coercion, inducement, or pressure. *Compare In re R.A.B.*, 399 A.2d 81 (admission elicited from accused by arresting officer) with *Harrison*, 281 A.2d 222 (confession elicited from accused at police station by officer investigating the crime). Accordingly, we do not find present in this case the sort of indicia of unreliability which the corroboration requirement was designed to prevent. *See supra* note 14; *see also*

*Smith*, 348 U.S. at 155 n. 3, 75 S.Ct. at 198 n. 3 ("Admissions give under special circumstances, providing grounds for a strong inference of reliability, may not have to be corroborated.").

**17.** A corroborated admission can be used to corroborate another extrajudicial admission. *See Smith*, 348 U.S. at 156, 75 S.Ct. at 199; *Johnson*, 191 U.S.App.D.C. at 197, 589 F.2d at 720.

**18.** Admissions made prior to a crime "contain none of the inherent weaknesses of confessions or admissions after the fact" and therefore do not require corroboration. *Warszower v. United States*, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941). Nevertheless, there was evidence presented here, particularly by the testimony of Anthony Williams and Lynette Vessells, corroborating the admissions of anal sodomy appearing in the diary prior to the October 16, 1980, entry.

ment of rent and procurement of medical treatment), particularly about sexual encounters. Lynette Vessells testified that appellant furtively made notes on a yellow paper pad after each of their sexual encounters at his apartment. All this evidence tended to demonstrate the reliability of the entire diary, and consequently the October 16, 1980, entry.

Viewing all the evidence in the light most favorable to the government, without distinguishing between direct and circumstantial evidence, and recognizing the jury's right to determine credibility, weigh the evidence and draw reasonable inferences, we conclude that there was sufficient evidence from which a jury could find beyond a reasonable doubt that appellant was guilty of committing the first charged sodomy. *See Jones v. United States,* 477 A.2d 231, 246 (D.C.1984).

## V

### A.

During the insanity phase of the trial appellant sought to waive his right to a so-called *Bolton* hearing.[19] Apparently appellant sought to waive that right so that the trial judge would not be in a position to give the standard instruction, Criminal Jury Instructions for the District of Columbia, No. 511 (3d ed. 1978), informing the jury that appellant would be entitled to a hearing within fifty days of a verdict acquitting him by reason of insanity and that such a hearing could result in his release from custody. *See United States v. Brawner,* 153 U.S.App.D.C. 1, 29–30, 41–42, 471 F.2d 969, 997–98, 1009–10 (1972) (en banc); *Lyles v. United States,* 103 U.S. App.D.C. 22, 25–26, 254 F.2d 725, 728–29 (1957), *cert. denied,* 356 U.S. 961, 78 S.Ct.

997, 2 L.Ed.2d 1067 (1958). The court indicated, however, that despite appellant's waiver it would order a release hearing to be held as prescribed by statute, D.C.Code § 24–301(d)(2) (1981). Appellant claims the statute entitled him to an absolute right to waive a *Bolton* hearing and therefore the court erred by refusing to accept his waiver. We think otherwise.

The procedures set forth in § 301(d) for commitment of insanity acquittees are designed to serve a dual purpose: first, treatment of the acquittee's mental illness and recovery of his sanity, and second, protection of the acquittee and society from his potential dangerousness. *Jones v. United States,* 432 A.2d 364, 368–69, 371 (D.C. 1981) (en banc), *aff'd,* 463 U.S. 354, 366, 368, 103 S.Ct. 3043, 3050, 3051, 77 L.Ed.2d 694 (1983). Conversely, "the only factors relevant to release from a mental institution are the acquittee's continued dangerousness and his need for treatment." *Jones,* 432 A.2d at 376. Once an insanity acquittee has recovered his sanity or is no longer dangerous the justification for his confinement evaporates. Upon such turn of events, the committed acquittee not only becomes "entitled to release," *Jones,* 463 U.S. at 368, but indeed "must be released" from the hospital, *Jones,* 432 A.2d at 370 (quoting *Dixon v. Jacobs,* 138 U.S.App.D.C. 319, 325, 427 F.2d 589, 595 (1970)). *Cf. United States v. Mendelsohn,* 443 A.2d 1311, 1317 (D.C.1982) ("retention of [a committed acquittee] as an inpatient after it is clear that outpatient treatment is preferable would contravene the policy underlying the requirement that insanity acquittees receive the least restrictive alternative treatment").

19. In *Bolton v. Harris,* 130 U.S.App.D.C. 1, 10, 395 F.2d 642, 651 (1968), the court held that "persons found not guilty by reason of insanity must be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings." *Bolton* required the hearing to be conducted after an acquittee had been committed to a psychiatric institution for evaluation of his present mental condition. The

purpose of the hearing is for the court to ascertain whether justification exists to order further commitment of an acquittee.

*Bolton's* requirement of a post-verdict judicial hearing was codified by the District of Columbia Court Reform and Criminal Procedure Act of 1970, PUB. L. No. 91–358, § 207, 84 Stat. 473, 602.

■ It would be anomalous to conclude, therefore, that an acquittee's decision to forego a *Bolton* hearing could operate to divest the court of its responsibility under § 301(d)(2) to "assur[e] that every acquittee has prompt opportunity to obtain release if he has recovered." *Jones,* 463 U.S. at 366, 103 S.Ct. at 3050. The mere fact that the trial court must hold a hearing within 50 days of an acquittee's confinement unless the acquittee waives it cannot be taken to mean that the trial court is forbidden to hold such a hearing unless the acquittee consents. *Cf.* D.C.Code § 16–705(a) (1981) (accused's waiver of jury trial subject to consent of court and prosecuting officer); *Jackson v. United States,* 498 A.2d 185, 189 n. 5 (D.C.1985) (same), and cases cited therein. Decisions respecting precisely when, within the statutorily prescribed time frame, a *Bolton* hearing will be held and whether to accept an acquittee's waiver are matters committed to the court's discretion, reversible only when that discretion is abused. *See Bolton,* 130 U.S.App.D.C. at 10 n. 50, 395 F.2d at 651 n. 50 (court can hold post-acquittal release hearing on its own motion); *cf.* D.C.Code § 24–301(e) (upon certification by hospital superintendent, court in its discretion may hold hearing to determine whether and on what, if any, conditions to release committed acquittee from hospital confinement).

■ We are hard pressed to perceive any abuse here. The result of the court's refusal to consent to appellant's waiver of his *Bolton* hearing was simply that appellant was given a hearing and, upon determination that he had recovered his sanity, was released from St. Elizabeth's Hospital. This is the very thing that § 301(d) guarantees him. It was no error for the court to ensure he got it.[20]

**B.**

■ Appellant also maintains that the trial court abused its discretion by denying his request for a continuance of the *Bolton* hearing. The hearing was commenced following receipt of a report from the Superintendent of St. Elizabeth's Hospital. The report, based on psychiatric evaluations conducted upon appellant, concluded that he had recovered his sanity and would not be dangerous to himself or others by reason of mental illness. The report recommended appellant's release conditioned on his transfer to a correctional setting. Appellant alleges that he learned of the contents of the report just the evening prior to the *Bolton* hearing, that he saw the report only one hour before the hearing, and that the conclusions and recommendations surprised him. He unsuccessfully moved for a continuance on that basis. At the hearing, a psychiatrist and a psychologist from St. Elizabeth's testified in support of the recommendations set forth in the Superintendent's report. Based on this evidence, the court concluded that appellant did not present a danger to himself or to the community as a result of any mental disease or defect and that he therefore was eligible for release from his confinement at St. Elizabeth's. Subsequently, the court entered a written order to that effect.

The grant or denial of a continuance is a matter within the sound discretion of the court and will not be reversed absent clear abuse. *Adams v. United States,* 466 A.2d 439, 443 n. 3 (D.C.1983); *Poteat v. United States,* 363 A.2d 295, 296 (D.C.1976) (per curiam); *Brown v. United States,* 244 A.2d 487, 489 (D.C.1968); *Gilmore v. United States,* 106 U.S.App.D.C. 344, 348, 273 F.2d 79, 83 (1959); *Neufield v. United States,* 73 U.S.App.D.C. 174, 179, 118 F.2d 375, 380 (1941), *cert. denied,* 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1942). It has been said that

A party seeking review of a refusal of a continuance must make a showing that the continuance is reasonably necessary for a just determination of the cause.

---

**20.** Given our holding, we find no merit in appellant's further contention that the court erred in giving the standard instruction. Criminal Jury Instructions for the District of Columbia, No. 511 (3d ed. 1978), discussed *supra,* at 1024.

Such a showing is made by offering to prove what evidence, if any, will be gained by the grant, and what relevance it has to the charge.

*Brown,* 244 A.2d at 489–90 (quoting *Gilmore,* 106 U.S.App.D.C. at 349, 273 F.2d at 84 (citing *Neufield,* 73 App.D.C. at 179, 118 F.2d at 380)). Appellant failed to make the requisite showing and thus was not entitled to a continuance.

Appellant had ample opportunity to prepare properly for the *Bolton* hearing. The court provided appellant more than seven weeks notice of the scheduled date of the hearing. There was certainly no mystery about the issue to be resolved at the hearing, *viz.,* whether appellant's present mental condition was such as to entitle him to release from hospital confinement. And appellant had long since retained an expert witness whose testimony presented during the insanity phase of the trial demonstrated that she was qualified to testify about appellant's mental condition.

Appellant asserts, however, that had he received the Superintendent's report further in advance of the hearing, his expert witness would have had a better opportunity to respond specifically to the contents of the report. Conceivably, such preparation may have enhanced appellant's chances to prove that his continued commitment was justified. But neither in his motion nor in this appeal has appellant explained with particularity how he could have prepared better for the hearing if the continuance had been granted. *See Neufield,* 73 App. D.C. at 179, 183, 118 F.2d at 380, 384. Under these circumstances we perceive no abuse of discretion in the court's refusal to continue the hearing.

## VI

Appellant's final contention relates to sentencing. He was convicted of first-degree premeditated murder while armed, first-degree felony murder (sodomy), first-degree felony murder (armed robbery), sodomy, and armed robbery. The court imposed sentences of 20 years to life imprisonment for each of the three murder convictions, to be served concurrently with one another; a sentence of 15 years to life for the armed robbery conviction, consecutive to the sentences for murder, and a sentence of 10 to 30 years for the sodomy conviction, consecutive to all other sentences. Appellant argues that the trial court erred twice, first by sentencing him for two felony-murders, and second by sentencing him for both felony-murder and the underlying felony. We agree.

This court has held that:

where one killing is involved, and the government advances alternat[ive] theories of felony murder based upon more than one underlying felony, the accused may not be convicted of more than one felony murder.

*Garris v. United States,* 465 A.2d 817, 823 (D.C.1983) (*Garris I*) (footnote omitted). *But see Adams v. United States,* 466 A.2d 439, 446–47 (D.C.1983).[21] Also, it is now clear beyond cavil that consecutive sentences cannot be imposed for felony murder and the underlying felony. *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Garris I,* 465 A.2d at 823; *Brown v. United States,* 464 A.2d 120, 125 n. 7 (D.C.1983); *Harling v. United States,* 460 A.2d 571, 572–73.[22] Where such sentences are imposed, we must remand with instructions that the trial court

**21.** An accused may be convicted of both premeditated murder and felony murder arising from a single killing, so long as concurrent sentences are imposed. *Harling v. United States,* 460 A.2d 571, 572 (1983), and cases cited therein. *But see Byrd v. United States,* 500 A.2d 1376 (D.C.1985) (imposition of concurrent sentences does not obviate the problem of multiple punishment inherent in dual convictions).

**22.** Imposition of concurrent sentences for felony murder and the underlying felony is also proscribed. *Doepel v. United States,* 434 A.2d 449, 459 (D.C.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981); *accord Graves v. United States,* 490 A.2d 1086, 1107 (D.C.1984) (en banc); *Leasure v. United States,* 458 A.2d 726, 730–31 (D.C.1983) (per curiam); *Tribble v. United States,* 447 A.2d 766, 774–75 (D.C.1982).

vacate the conviction for felony murder or the conviction for the underlying felony, whichever the trial court deems more suitable to effectuate its original sentencing plan. *Garris v. United States*, 491 A.2d 511, 514 (D.C.1985) (*Garris II*); *see Harling* 460 A.2d at 574.

Applying these rulings to the case before us, we remand to the trial court with instructions either to vacate both of the felony murder convictions or to vacate one felony murder conviction and the non-corresponding felony conviction.

In all other respects the judgment of the trial court is affirmed.

*So ordered.*